UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

MICHAEL JONES,

                                        Plaintiff,

            vs.                                      9:10-CV-1331
                                                     (GLS/ATB)
BRIAN FISCHER, DAVID ROCK,
*et al.*,

                                        Defendants.

_____

MICHAEL JONES, Plaintiff, *pro se*
KRISTA A. ROCK,
Asst. Attorney General for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for Report and Recommendation by the

Honorable Gary L. Sharpe, Chief United States District Judge, pursuant to 28 U.S.C. §

636 (b) and Local Rules N.D.N.Y. 72.3(c).[1]

In this amended civil rights complaint, plaintiff alleges that defendants have

violated his rights to proper medical care, due process, and his right to be free from

cruel and unusual punishment. (Dkt. No. 5).  Plaintiff also alleges that defendants

violated his rights under the Americans with Disabilities Act, 42 U.S.C. § 12132 *et

seq.* (Dkt. No. 5).  Presently before the court is the defendants' motion to dismiss the

amended complaint pursuant to Fed. R. Civ. P. 12(b)(6). (Dkt. No. 37).  Plaintiff has

_____

[1] The case was reassigned from other judges to Chief Judge Sharpe and me by order dated
November 29, 2011. (Dkt. No. 35).

responded in opposition to the motion, and defendants have filed a reply. (Dkt. Nos. 42, 43).  For the following reasons, this court will recommend granting the defendants' motion in part, and denying it in part.

## DISCUSSION

I.   **Facts and Procedural History**

A.   **Procedural History**

The original complaint in this action named only defendants from the Albany Offices of the Department of Corrections and Community Supervision ("DOCCS"), and from Upstate Correctional Facility ("Upstate").[2] (Dkt. No. 1).  The original complaint alleged only claims relating to plaintiff's medical condition relative to his double-cell lower bunk assignment and his problems with uncomfortable seating in the visiting room. (Dkt. No. 1).  In plaintiff's amended complaint, he added several defendants from Clinton Correctional Facility Annex ("Clinton"), claiming violations of his Eighth Amendment rights based on his removal from a "low sodium" diet, his due process rights relative to a disciplinary hearing, and claims of "retaliation."[3] (Dkt.

---

[2] The original complaint named: Brian Fischer, Commissioner of DOCCS (Albany); J. Carver, Classification and Movement (Albany); David Rock, Superintendent of Upstate; and K Rabideau, Nurse at Upstate. (Dkt. No. 1).

[3] In addition to defendants Fischer, Rock, and Rabideau, plaintiff added the following defendants: Theresa David, the Director of Classification and Movement (Albany); L. Whalen, Corrections Counselor (Clinton); Lt. Chase (Clinton); J. Eggeston, Hearing Officer (Clinton); S. Meskunas, Hearing Officer (Clinton); A. Prack, Director of the Special Housing Unit (SHU) (Clinton); C. Leon, Food Service Administrator (Clinton), and C.O. Lincon, Corrections Officer (Clinton). (Dkt. No. 5).

No. 5).

On February 3, 2011, Senior U.S. District Judge McAvoy ordered that plaintiff's motion for *in forma pauperis* (IFP) status be granted, but dismissed the following claims and defendants without prejudice: J. Carver[4] and C.O. Lincon; plaintiff's conspiracy claims; and plaintiff's claims that he was denied adequate warmth or food at Upstate. (Dkt. No. 6).

On May 16, 2011, defendants made a motion to revoke plaintiff's IFP status pursuant to 28 U.S.C. § 1915(g) based upon plaintiff's accumulation of "three strikes." (Dkt. No. 25).  On December 1, 2011, after briefing by both sides, in this and in a related action,[5] plaintiff paid the filing fee in this action, rendering the defendants' "three strikes" motion moot.  Defendants filed this motion to dismiss on December 19, 2011. (Dkt. No 37).

### B.    Facts

#### 1.    Special Diet (Clinton)

---

[4] Plaintiff omitted defendant Carver, from the DOCCS Movement and Classification Department, from his amended complaint.  Instead, in his amended complaint, plaintiff names Theresa Knapp-David, the Director of Movement and Classification.

[5] *Jones v. Smith, et al.*, No. 9:09-CV-1058.  In 9:09-CV-1058, defendants made the identical motion to revoke plaintiff's IFP status. (Dkt. No. 75, 78, 79).  On December 6, 2011, I recommended that the "three strikes" motion be granted and that plaintiff be required to pay the filing fee before that case could proceed. (Dkt. No. 83).  Chief Judge Sharpe adopted the Report-Recommendation on January 23, 2012, and ordered dismissal of the action within forty-five days if plaintiff did not pay the filing fee. (Dkt. No. 85).  Plaintiff did not pay the fee in that case, but filed a notice of appeal. (Dkt. No. 86).

The court will summarize the facts in plaintiff's remaining claims.  Plaintiff claims that on June 14, 2010, while he was incarcerated at Clinton, defendant Leon told plaintiff that he was removing plaintiff's name from the "special diet meal list." (Amended Complaint (AC) at 6, ¶ (h)).[6]  Plaintiff alleges that when he asked why he was being removed from this list, defendant Leon stated that plaintiff knew why, and it was because "'I was you eating toast.'" (*Id.*)  Plaintiff claims that his "special diet" was low sodium, based upon plaintiff's high blood pressure.  As a result of his removal from the diet, plaintiff states that he experienced headaches and dizziness. (*Id.* at 6, ¶ (i))  When he went to the facility clinic, he was allegedly told that due to his elevated blood pressure, he would have to be monitored to determine whether he should be placed on medication. (*Id.*)  Plaintiff filed a grievance against defendant Leon.[7] (*Id.* at 6 (j)).

## 2.     Retaliation and Due Process (Clinton)

Plaintiff claims that on June 29, 2010, he was sitting in the hall, waiting to be interviewed by the grievance committee, when the "corridor Officer" asked plaintiff what his grievance was about. (*Id.*)  Plaintiff states that when he explained the nature

---

[6] Plaintiff has numbered the pages of his amended complaint at the bottom.  He has also identified paragraphs on each page by letter.  However, plaintiff begins each cause of action with a new set of letters, beginning with ¶ (a).  Thus, to properly cite to the amended complaint, the court will first cite the bottom page of the document and then cite to the lettered paragraph in which the cited facts are stated.

[7] Although plaintiff does not specifically state that he filed a grievance, the next paragraph refers to the "grievance" he filed. (AC at 6, ¶ (j)).

of his grievance, the "corridor Officer" said that plaintiff would lose his grievance because defendant Leon was well-liked, "and filing grievance complaint's [sic] in Clinton Annex[] would cause plaintiff a lot of problems." (*Id.*)

Plaintiff claims that one or two weeks after this encounter with the "corridor Officer," plaintiff was on his way to a visit with his wife, when the "hall Officer" asked if plaintiff had a permit for his wedding band. (*Id.* at 7, ¶ (k)). Plaintiff states that the "hall Officer" gave plaintiff a hard time about the wedding band and sent plaintiff back to his dorm to take his wedding band off and go to his visit without the ring.[8] The officer then told plaintiff that this "was only the beginning" because plaintiff liked to write grievances at Clinton Annex. (*Id.* at 7, ¶ (m)) Plaintiff states that he wrote a grievance, complaining about the "hall Officer," and plaintiff explained to the investigating Sergeant that the "hall Officer's" action was a result of the grievance that he wrote against defendant Leon. The "Sergeant" who was investigating the grievance allegedly told plaintiff that "that was how things work in Clinton Annex." (*Id.* at 7, ¶ (n)).

The next few paragraphs of the amended complaint discuss an incident with former defendant Lincon on July 8, 2010, involving plaintiff and his wife. (*Id.* at 8, ¶ (o)). Plaintiff claims that when his wife complained about a long delay in the

---

[8] Plaintiff claims that he explained to the officer that the permit was on "file" in the package room, but the officer told plaintiff that he had to return to his cell and take off the ring. (AC at 7, ¶ (i)).

"processing area" before she could visit with plaintiff, defendant Lincon told her she would have to endure another long delay because it was "his count time." (*Id.*) Although plaintiff's wife asked to speak with a supervisor, defendant Lincon became belligerent and told her that she should "take it up with Govern [sic] Patterson because he was the person cutting all the jobs." (*Id.*) Plaintiff claims that he and his wife complained about defendant Lincon's conduct, and were told that complaints against staff were not looked upon favorably. (*Id.* at 8, ¶ (q)).

Plaintiff alleges that, as he was exiting the bathroom on July 23, 2010, he was escorted to SHU. (*Id.* at 8, ¶ (r)). On July 26, 2010, plaintiff was escorted to an interview room inside the SHU, where he was questioned by defendant Chase about "all" the grievances and complaints that plaintiff filed while he was at Clinton Annex. (*Id.* at 9, ¶ (s)). Plaintiff states that he told defendant Chase that he was being harassed, and asked defendant Chase why plaintiff was "being held in SHU." (*Id.*) Defendant Chase allegedly told plaintiff that he placed plaintiff in SHU, and he could do whatever he wanted at Clinton Annex. Plaintiff states that he was thereafter issued a misbehavior report, charging him with threats, rioting, false statements, and impersonation. (*Id.*)

Plaintiff alleges that the disciplinary hearing on the above charges was held on July 29, 2010, and defendant Eggleston was the hearing officer. Plaintiff claims that he told defendant Eggleston that the charges were false, and that the "threatening letter

was an attempt by someone to have inmate Alexander removed [from] the ILC

Committee because of a very controversial issue that he placed on the ILC agenda."[9]

(*Id.* at 9, ¶ (t)).  Plaintiff states that he tried to explain that the incident "in the

threatening letter happen[ed] while [plaintiff] was on the Family Reunion Visit with

his wife." (*Id.*)

Plaintiff alleges that when defendant Chase arrived to testify at plaintiff's

disciplinary hearing, he had an ex parte discussion with defendant Eggleston for

"approximately seven minute[s]," during which time, plaintiff was told to stand

outside the hearing room. (*Id.* at 9, ¶ (u)).  Plaintiff then recounts defendant Chase's

testimony at the disciplinary hearing. (*Id.* at 10, ¶ (v)).  Plaintiff claims that defendant

Chase testified that plaintiff wrote the threatening letter, and that in making this

determination, reviewed handwriting samples of eight other inmate porters.  Plaintiff

claims that this testimony was insufficient because defendant Chase was not trained in

handwriting analysis and could not prove "beyond a reasonable doubt" that plaintiff

wrote the letter. (*Id.*)

Plaintiff asked defendant Eggleston for a copy of the handwriting samples that

defendant Chase reviewed and also asked defendant Eggleston to review the samples

himself so that she could make her own independent determination as to whether those

other inmates should be excluded as the author of the "threatening letter." (*Id.* at 10,

---

[9] "ILC" stands for Inmate Liaison Committee.

¶ (w)).  Defendant Whalen testified that she was not a handwriting expert either, but "in her view," some of the characters in the threatening letter appeared to match plaintiff's handwriting. She was the individual who reported the incident to defendant Chase. (*Id.* at 10. ¶ (x)).

Plaintiff states that defendant Eggleston found plaintiff guilty even though inmate Alexander testified on plaintiff's behalf that Alexander was a member of the ILC, and that he was being "set up" because of a controversial issue that he had placed on the agenda of the ILC, involving dorm officers' illegal gambling and other conduct on duty. (*Id.* at 11, ¶ (y)).  Plaintiff claims that defendant Eggleston sentenced plaintiff to a total of 90 days SHU, loss of telephone and commissary privileges, and "loss of good time."[10] (*Id.* at 9, ¶ (z)).

Plaintiff alleges that while he was still in SHU, on July 27, 2010, defendant Whalen issued plaintiff a misbehavior report, charging him with refusing a direct order, a telephone program violation, and "Exchanging pins." (*Id.* at 11, ¶ (a-1))  The hearing for these charges was conducted by defendant Meskunas. (*Id.* at 11, ¶ (b-1)). Plaintiff alleges that during the hearing, he testified that he was handcuffed and taken to SHU on July 23, 2010, and all of his property was left in his "curb."[11] (*Id.*)  Plaintiff

---

[10] Plaintiff also complains that he was not given appropriate credit for his pre-hearing confinement in SHU on these charges. (AC at 11).

[11] Plaintiff may be referring to his "cube," which is another word for his cell.

claims that someone must have taken his property and used his telephone number while he was in SHU. (*Id.*)  Plaintiff claims that defendant Meskunas refused to call plaintiff's witness, inmate Anthony Mosely, who allegedly would have testified about the telephone. (*Id.* at 12, ¶ (c-1)).  Plaintiff states that defendant Meskunas found plaintiff guilty of telephone program violations and of exchanging "pins," but not guilty of refusing a direct order.  Plaintiff states he was sentenced to two months loss of telephone and commissary privileges. (*Id.* at 12, ¶ (d-1)).  Plaintiff claims that defendant Maskunas was biased and did not call plaintiff's witnesses.  Plaintiff states that defendant Prack affirmed both disciplinary determinations on appeal. (*Id.* at 12, ¶ (e-1)).

### 3.    Medical Care and ADA Claims (Upstate)

Plaintiff states that he was transferred to the Upstate SHU on August 24, 2010, and that upon his arrival, he was placed in a double cell and assigned to the bottom bunk. (AC at 12, ¶¶ (7-a, 7-b)).  Plaintiff told the intake nurse that he could not be assigned to a bottom bunk because of his prior back surgery. (*Id.* at 13, ¶ (c)).  Plaintiff states that he told the nurse that the surgery resulted in a limitation on his range of motion, and it would cause him extreme pain if he had to climb in and out of a bottom bunk. (*Id.* at 12, ¶ (e)).  The intake nurse told plaintiff that she would speak to the Sergeant.  Plaintiff repeated his concerns to the Sergeant, who after checking with a computer printout from "Movement and Classification," told plaintiff that "it

was okay for plaintiff to be housed in a double bunk cell and if he had a problem with

that, to take it up with inmate grievance or Superintendent Rock." (*Id.* at 13, ¶ (f)).

Plaintiff states that he wrote a grievance regarding this issue, but that defendant

Rabideau reviewed plaintiff's chart and found that plaintiff was cleared to be assigned

to a double bunk bottom bunk, denying plaintiff's request to be assigned to a single

cell. (AC at 14, ¶ (i)).

Plaintiff also alleges that on August 29, 2010, he went to a visit with his wife,

but he had to sit on a small round stool, causing him back pain and requiring him to

lean forward to speak with his wife. (*Id.* at 12, ¶ (h)).  Plaintiff states that on

September 13 and 27, he complained to defendant Rock when Superintendent Rock

was making his rounds of the facility, but the Superintendent simply smiled and

walked away. (*Id.* at 14, ¶ (i)).  On November 1, 2010, plaintiff claims that he asked

defendant Rock why plaintiff's property was not packed because he was scheduled to

be released on November 2, 2010. (*Id.* at 14, ¶ (j)).  Plaintiff claims that defendant

Rock told plaintiff to speak with the Sergeant, and that the Sergeant told plaintiff that

he could be "held" for up to 30 days past his release date. (*Id.*)  Plaintiff states that he

did not leave Upstate until November 4, 2010, and was thus, held two days past his

release date. (*Id.*at 14, ¶ (k)).

## II.   <u>Motion to Dismiss</u>

To survive dismissal for failure to state a claim, the complaint must contain

sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice.  *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555).  Plaintiff's factual allegations must also be sufficient to give the defendant "'fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp.*, 550 U.S. at 555 (citation omitted).

When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir. 1995).  The court must heed its particular obligation to treat *pro se* pleadings with liberality.  *Phillips v. Girdich*, 408 F.3d 124, 128 (2d Cir. 2005); *Tapia-Ortiz v. Doe*, 171 F.3d 150, 152 (2d Cir. 1999) (*per curiam*).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference.  *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the

complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment).

## III.   **Eleventh Amendment**

The state itself cannot be sued under section 1983. *Komlosi v. New York State OMRDD*, 64 F.3d 810, 815 (2d Cir. 1995) (citing *Will v. Michigan Department of Police*, 491 U.S. 58, 71 (1989)).  This is true whether the court is considering Eleventh Amendment immunity or a statutory interpretation of section 1983. *Id.* at 815 n.3.  An action against state officers in their official capacities is tantamount to an action against the state. *Yorktown Medical Laboratory, Inc. v. Perales*, 948 F.2d 84, 87 & n.1 (2d Cir. 1991) (citations omitted).

Plaintiff states that he is suing defendants in their individual and official capacities. (AC at 15, ¶ 8(b)).  To the extent that plaintiff is attempting to sue defendants for damages in their official capacities or to the extent that his complaint can be interpreted as raising such official capacity claims, he is barred by the Eleventh Amendment from doing so.  All such claims may be dismissed with prejudice.

## IV.   **Medical Care/ADA Claims**

### A.   **Legal Standards**

#### 1.   **Constitutional Standard**

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently

harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  There are two elements to the deliberate indifference standard.  *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003).  The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind.  *Id.* at 184 (citing inter alia *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006)(citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Determining whether a deprivation is sufficiently serious also involves two inquiries. *Id.*  The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (citing *Farmer*, 511 U.S. at 844-47).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious." *Id.* at 280.  The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff.  *Id.* (citing *Helling v. McKinney*, 509 U.S. 25, 32-33 (1993)).  If the "unreasonable care" consists of a failure to provide ***any*** treatment, then the court

examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003)).  However, in cases where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id.*  If the plaintiff is receiving ongoing treatment, and the issue is an unreasonable delay or interruption of the treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Id.* (citing *Smith*, 316 F.3d at 185).  Thus, the court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for an Eighth Amendment claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability.  *Id.* at 280.

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Id.* (citing *Wilson v. Seiter*, 501 U.S. 294, 300 (1991)).  In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care.  *Id.* (citing *Farmer*, 511 U.S. at 835-37).  Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id.*  Deliberate indifference is equivalent to subjective recklessness. *Id.* (citing *Farmer*, 511 U.S. at 839-40).

In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety.  *Id.* (citing

14

*Chance*, 143 F.3d at 702).  The defendant must both be aware of the facts from which

the inference could be drawn that a substantial risk of serious harm exists, and he or

she must draw that inference. *Chance*, 143 F.3d at 702 (quoting *Farmer v. Brennan*,

511 U.S. 825, 837 (1994)).  The defendant must be subjectively aware that his or her

conduct creates the risk; however, the defendant may introduce proof that he or she

knew the underlying facts, but believed that the risk to which the facts gave rise was

"insubstantial or non-existent." *Farmer*, 511 U.S. at 844.  Thus, the court stated in

*Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm

"need not be sound so long as it is sincere," and "even if objectively unreasonable, a

defendant's mental state may be nonculpable." *Salahuddin*, 467 F.3d at 281.

Additionally, a plaintiff's disagreement with prescribed treatment does not rise

to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health

Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001).  Prison officials have broad

discretion in determining the nature and character of medical treatment afforded to

inmates. *Id.* (citations omitted).  An inmate does not have the right to treatment of his

choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986).  The fact that plaintiff

might have preferred an alternative treatment or believes that he did not get the

medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the

need for specialists, and the timing of their intervention implicate medical judgments

and not the Eighth Amendment. *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle*, 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id.  See also Daniels v. Williams*, 474 U.S. 327, 332 (1986) (negligence not actionable under Section 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983.

### 2.    ADA Claims

The ADA is applicable to inmates in state correctional facilities. *See Allah v. Goord*, 405 F. Supp. 2d 265, 274 (S.D.N.Y. 2005) (both the ADA and the Rehabilitation Act are applicable to inmates). Under the ADA, the inmate must establish that he (1) is a qualified individual with a disability; (2) is being excluded from participation in, or being denied benefits of some service, program or activity by reason of his or her disability; and (3) the entity providing the service is a public entity. *Allah v. Goord*, 405 F. Supp. 2d 265, 274 (S.D.N.Y. 2005).

In order to establish a claim under the ADA, the plaintiff must first show that he has a disability. *Farid v. Bouey*, 554 F. Supp. 2d 301, 326 (N.D.N.Y. 2008). Under the Title II of the ADA, a disability is defined as a physical or mental impairment that substantially limits one or more of the plaintiff's major life activities. *Id.* (citing *inter alia Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 147 (2d Cir. 2002); *Doe v. Goord*, No. 04-CV-570, 2004 WL 2829876 at *17, 2004 U.S. Dist. LEXIS 24808

(S.D.N.Y. Dec. 10, 2004); 42 U.S.C. § 12102(2); 29 U.S.C. § 705(20)(B)).  Plaintiff must identify the activity that he claims is impaired and establish that it constitutes a "major life activity." *Weixel*, 287 F.3d at 147.

Major life activities include, among others, caring for oneself; performing manual tasks; seeing, hearing; speaking; breathing; learning; reading; communicating; and working. 42 U.S.C. § 12101(2)(A).  Major life activities also include the operation of a major bodily function such as the immune system; digestive system; neurological system; respiratory; bladder; brain; endocrine; reproductive and circulatory systems. *Id.* § 12101(2)(B).  A substantial limitation is one that prevents or severely restricts the individual from doing activities that are of "central importance most people's daily lives." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002).

B.    **Application**

1.    **Special Diet**[12]

Plaintiff claims that on June 29, 2010, while he was at Clinton, defendant Leon took plaintiff off a "special diet" list.  The list apparently included a restriction on sodium.  Plaintiff's cryptic statement about what defendant Leon said to plaintiff

---

[12] Any claim that plaintiff was denied his special diet relates only to a constitutional claim because plaintiff does not allege that his diet restrictions constitute a limitation on a "major life activity," nor does he allege that he was deprived of access to any services, programs, or activity "by reason of" his dietary requirement or that the need for a low sodium diet is a "disability" under the statute. *See Farid v. Demars*, No. 9:06-CV-1545, 2009 WL 455450 (N.D.N.Y. Feb. 23, 2009) (dismissing inmate's ADA claim that he was not allowed to obtain special low sugar foods for his diabetic condition).

before he took plaintiff off the list is clearly a typographical error.  It appears that plaintiff was taken off the list because defendant Leon saw plaintiff eating toast.[13] Plaintiff states that, as a result of being removed from the low sodium diet, he experienced headaches and dizziness. (AC at 6, ¶ (i)).  Plaintiff states that he went to the facility clinic and was told that his blood pressure was high and needed to be monitored for medication.  Although the complaint makes no further statements regarding the diet issue, plaintiff's response to the motion to dismiss is much more specific, and he has included a substantial number of exhibits in support of the amended complaint.[14]

In the amended complaint, plaintiff states that he filed a grievance, complaining about being removed from the special diet list. (AC at 6, ¶ (j)).  In his response the motion to dismiss, plaintiff attaches the grievance document, which indicates that it was filed June 17, 2010, three days after the incident with defendant Leon. (Dkt. No.

---

[13] "I was you eating toast" does not make sense.  A review of the documents submitted with plaintiff's response shows that plaintiff meant to say that defendant Leon told plaintiff that he would be taken off the special diet list because Leon *saw* plaintiff eating toast.

[14] A motion to dismiss is addressed to the face of the complaint, including any attachments and information incorporated by reference.  This court has considered plaintiff's current submission and exhibits as clarification of his claims. *Accord Gil v. Mooney*, 824 F.2d 192, 195 (2d Cir. 1987) (considering plaintiff's response to motion to dismiss); *Mest v. Naguib*, No. 08-CV-416A(F), 2010 WL 1644189, at *3 (W.D.N.Y. March 30, 2010) (considering plaintiff's response to the motion to dismiss as amending the complaint by alleging additional clarifying facts) (Report-Recommendation), *adopted*, 2010 WL 1644180 (W.D.N.Y. April 22, 2010); *Fox v. City of New York*, No. 03 Civ. 2268, 2004 WL 856299, at *1 (S.D.N.Y. April 20, 2004) (considering plaintiff's response papers and any other documents that are referenced in his papers on the motion to dismiss); *Johnson v. Wright*, 234 F. Supp. 2d 352, 356 (S.D.N.Y. 2002) (considering plaintiff's response briefs on motion to dismiss).

42-1, Ex. P).  A letter dated June 20, 2010, written by plaintiff, complaining about the incident is attached to the grievance form. (Dkt. No. 42-1 at 41-42, Ex. P).  Plaintiff has also submitted the "Therapeutic Diet Request Form,"[15] dated June 1, 2010, and signed by two health care providers. (Dkt. No. 42-1, Ex. X).  On July 15, 2010, plaintiff's grievance requesting reinstatement on the therapeutic diet list was granted by M. Patnode, Deputy Superintendent of Programs (DSP). (Dkt. No. 42-1, Ex. Z). Thus, it appears that plaintiff could have been denied his therapeutic diet for approximately one month, from June 15, 2010 to July 15, 2010.

The intentional failure to provide an inmate with a medically prescribed diet for a prolonged period of time can state an Eighth Amendment claim. *Davidson v. Desai*, 817 F. Supp. 2d 166, 189 (W.D.N.Y. 2011) (citing *Phelps v. Kapnolas*, 308 F.3d 180, 186 (2d Cir. 2002) (holding that plaintiff stated an Eighth Amendment claim when he alleged that prison officials deprived him of a nutritionally adequate diet for 14 days and knew that it was likely to inflict pain and suffering); *Abdush-Shahid v. Coughlin*, 933 F. Supp. 168, 180 (N.D.N.Y. 1996) (constitution requires serving inmates nutritionally adequate food prepared and served under conditions that do not present imminent danger to the inmates' health and well-being)).

In *Collazo v. Pagano*, 656 F.3d 131, 135 (2d Cir. 2011), the Second Circuit

---

[15] The form indicates that the diet requested for plaintiff was "Controlled A," consisting of "enhanced fiber, low fat/cholesterol/sodium." (Dkt. No. 42-1, Ex. X).  Plaintiff has also included the facility rules regarding therapeutic diets. (Dkt. No. 42-1, Ex. Y).

granted summary judgment on a claim that Inmate Collazo's special dietary status had been improperly revoked, but only after finding no question of material fact indicating that the defendant had the requisite state of mind when he twice revoked Collazo's dietary status.  The court also found that "once Pagano became aware that Collazo's 'violations' [of mess hall rules] were the result of an innocent misunderstanding, the special diet was restored." *Id.*

*Davidson v. Desai*, was also decided on a motion for summary judgment, and the court considered medical records, which illustrated why plaintiff was prescribed the diet, and the court discussed the circumstances surrounding whether or not it was properly provided to the plaintiff).  Although the court ultimately granted summary judgment in favor of the defendants, the court reviewed the medical records as well whether plaintiff suffered any adverse health impact from the discontinuance of his medically prescribed diet. 817 F. Supp. 2d at 190.  In this case, while it may be that plaintiff will be unable to prevail on this issue, he has stated a claim for relief at this early stage, and the court will not recommend granting a motion to dismiss on the plaintiff's medical care claim.[16]  *See also Benn v. Nassau County*, No. 10-CV-1963,

---

[16] The court does note, however, that the therapeutic diet claim is alleged only against defendant Leon.  There are no other defendants who were personally involved in the alleged deprivation.  DSP Patnode granted plaintiff's grievance and is not a defendant.  There are no further allegations against any of the existing defendants about this claim.  As discussed below, personal involvement is a prerequisite to the assessment of damages in a section 1983 case.  Thus, if plaintiff intended to include other defendants in this claim, it would be subject to dismissal as against all defendants except defendant Leon.

2010 WL 2976540, at *6 (E.D.N.Y. July 22, 2010) (refusing to grant a motion to dismiss when the court was uncertain as to the facts surrounding denial of medical diet and other medical care issues).

### 2.   Double Cell/Bottom Bunk

### (a)   Eighth Amendment Claims

Plaintiff alleges that he was transferred to Upstate on August 24, 2010, and upon his arrival, he learned that he would be housed in a double cell, with a bottom bunk assignment. (AC at 12).  Plaintiff states that he had back surgery[17] and has fused vertebrae. (AC at 13).  Plaintiff states that he told "the intake nurse" at Upstate that if plaintiff had to sleep in a bottom bunk, it would "cause sharp extreme back pain to climb in and out . . . ." (*Id.*)  Plaintiff alleges that he was later told that "Movement and Classification said" that plaintiff was cleared to be housed in a double bunk cell, "and if he had a problem with that, to take it up with inmate grievance or Superintendent Rock." (*Id.*)

Plaintiff alleges that he wrote a grievance about this issue on August 25, 2010 and actually spoke to defendant Rock about the bottom bunk "on or about the weeks of September 13, and 27, 2010" while Superintendent Rock was "making his rounds." (*Id.*)  Plaintiff claims that defendant Rock merely looked at plaintiff, "smiled and

---

[17] Attached as Exhibit F1 to plaintiff's opposition papers is the Discharge Summary, dated October 4, 2006, from plaintiff's hospitalization for back surgery, which was performed on September 20, 2006. (Dkt. No. 42-1, Ex. F1).

walked away." (*Id.*)  In his response to the motion to dismiss, plaintiff alleges that

defendant Rock acknowledged plaintiff's complaints, but did not rectify the problem,

stating that Upstate did not have any single cells to accommodate plaintiff's disability.

Plaintiff also alleges that defendant Rabideau, a nurse, reviewed his chart and

determined that plaintiff was "cleared" to be assigned to a double bunk cell. (AC at

14).

### (i)    Nurse Rabideau

The only named defendant that plaintiff alleges was personally involved in the

denial of a single sell was defendant Rabideau.  The other defendants who plaintiff

discusses in this section of the amended complaint are supervisory officials, who

would not necessarily be involved in a medical decision.  With respect to defendant

Rabideau, the amended complaint is quite clear in stating that, after plaintiff filed his

grievance, Nurse Rabideau reviewed plaintiff's medical file and made a decision that

he was "cleared" for the double bunk assignment.[18] (AC at 14).  Even if she were

incorrect, was negligent in making her determination, or the appropriate information

was not in plaintiff's file, defendant Rabideau would not be liable for a constitutional

violation because negligence is not actionable under section 1983. *Daniels v.*

*Williams*, 474 U.S. at 332.  A nurse's failure to properly review the medical records

---

[18] From the language of the complaint, it appears that Nurse Rabideau investigated the grievance that plaintiff says he filed on August 25, 2010. (AC at 14, ¶ g).  Plaintiff states that after her investigation she "denied plaintiff's request to be house [sic] in a single cell." (*Id.*)

does not rise to the level of a constitutional violation. *See Holmes v, Fell*, 856 F. Supp. 181, 183 (S.D.N.Y. 1994).  Plaintiff's disagreement with Nurse Rabideau's decision does not rise to the level of an Eighth Amendment claim.[19]

### (ii)    Superintendent Rock

Defendant Rock is the Superintendent of Upstate, and his only involvement appears to have been speaking to plaintiff while defendant Rock was making his rounds of the plaintiff's housing unit. (AC at 14, ¶ i).  Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citation omitted); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). In *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction.  *Id.*  The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong.  *Id.*  Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue.  *Id.*  Finally, a supervisory official may be personally involved if

---

[19] The court will discuss the potential ADA claim in a separate subsection.

he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.  See also Iqbal v. Hasty*, 490 F.3d 143, 152–53 (2d Cir. 2007) (citing *Colon v. Coughlin*, 58 F.3d 865, 873) (2d Cir. 1995)), *rev'd on other grounds*, 556 U.S. 662 (2009).

The failure of a supervisory official to investigate a letter of protest written by an inmate is insufficient to establish personal involvement. *Smart v. Goord*, 441 F. Supp. 2d 631, 642–643 (S.D.N.Y. 2006).  Mere notice of alleged wrongdoing is insufficient to establish a supervisor's or administrator'[s] personal involvement. *Gibson v. Comm'r of Mental Health*, No. 04 Civ. 4350, 2008 WL 4276208, at *8, 2008 U.S. Dist. LEXIS 70080, at *27 (S.D.N.Y. Sept. 17, 2008).  While mere receipt of a letter from a prisoner is insufficient to establish individual liability . . . '[p]ersonal involvement will be found . . . where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint.'" *Boddie v. Morgenthau*, 342 F. Supp. 2d 193, 203 (S.D.N.Y. 2004) (quoting *Johnson v. Wright*, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002).

In this case, plaintiff alleges that because he spoke to defendant Rock about the bunk assignment while he was making rounds, Rock became personally involved in the alleged violation when he ignored plaintiff's request.  Just as the failure to respond to a letter of protest is insufficient to constitute personal involvement, this conduct by defendant Rock is insufficient to assert that he was personally involved in any

24

deliberate indifference claim regarding plaintiff's bunk assignment, particularly because this issue involved medical decisions beyond the purview of non-medical personnel.

Plaintiff also alleges that defendant Rock was personally involved because he responded to plaintiff's grievances.  Plaintiff submits a memorandum from defendant Rock, returning plaintiff's grievances, and telling him that he needed to follow proper grievance procedures. (Dkt. No. 42-1 at 34).  The memorandum from defendant Rock, telling plaintiff he needed to take his grievance[20] through the proper channels is not sufficient to establish personal involvement.  Although defendant Rock "received" plaintiff's grievance, he did not "act" on plaintiff's grievance.  Returning plaintiff's grievances so that he could challenge the bottom bunk issue properly does not constitute personal involvement and may be dismissed as against defendant Rock.  *See e.g., Liner v. Goord*, 310 F. Supp. 2d 550, 555 (W.D.N.Y. 2004) ("Where a supervisor's involvement in a prisoner's complaint is limited to forwarding of correspondence to appropriate staff, the supervisor has insufficient personal involvement to sustain a § 1983 cause of action.")

### (iii)   Theresa Knapp-David and Brian Fischer

Theresa Knapp-David was the director of Movement and Classification, and

---

[20] It is unclear to which grievances defendant Rock was referring, because plaintiff filed various grievances during the relevant time period.  Defendant Rock's memorandum was dated October 22, 2010.

Brian Fischer is the Commissioner of DOCCS.  In the amended complaint, plaintiff names defendant Knapp-David because plaintiff claims that he was told "the intake Sergeant ha[d] a computer printout stating that Movement and Classification said that it was okay for plaintiff to be housed in a double bunk cell and if he had a problem with that, to take it up with inmate grievance or Superintendent Rock." (AC at 13, ¶ f). There is no indication that defendant Knapp-David, who is the director of "Classification and Movement"[21] was personally involved in the decision to place plaintiff in a double-bunked cell or that she had any involvement in issuing the "computer printout."  In his response to the motion to dismiss, plaintiff states that, as the person in charge of classification and movement, defendant Knapp-David was responsible for plaintiff's assignment through her "delegated policy-making [authority]." (Dkt. No. 42 at 9). This statement by plaintiff is not a proper allegation of personal involvement, instead, it is an attempt at alleging liability by *respondeat superior*.  Plaintiff cites no "policy" instituted by defendant Knapp-David that would have caused plaintiff to be assigned to a double-bunked cell.[22]

The same is true for defendant Fischer.  There is no indication that he was aware of, or caused plaintiff's housing assignment.  It is implausible to allege that the

---

[21] In his response to the defendants' motion to dismiss, plaintiff includes an exhibit, consisting of a newspaper article, showing that Theresa Knapp-David was the director of Classification and Movement. (Dkt. No. 42-1, Ex. I).

[22] In his response to the motion to dismiss, plaintiff also states that he was told that Upstate "does not have any single cells to accommodate plaintiff's [medical] need." (Dkt. No. 42 at 9).

Commissioner of DOCCS would be responsible for one inmate's housing assignment, without any more information.  To allow personal involvement to be stated in such a way would result in defendant Fischer being personally involved in every alleged violation because he is the "policy-maker" for the department.  Thus, plaintiff's eighth amendment claim may be dismissed as against defendants Knapp-David and Fischer.

### (b)    ADA Claims

Plaintiff alleges that defendants have violated Title II of the ADA by assigning him to a bottom bunk at Upstate and by failing to have appropriate seating in the visiting room at Upstate, causing plaintiff pain while visiting with his wife.  Title II forbids discrimination against persons with disabilities in public services, programs and activities.[23] *Tennessee v. Lane*, 541 U.S. 509, 516-17 (2004); 42 U.S.C. § 12132. While the defendants must be sued in their individual capacities for purposes of section 1983, defendants may ***not*** be sued in their "individual" capacities for violations of the ADA. *Garcia v. S.U.N.Y. Health Science Center of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001).  Any suit for statutory relief would have to be against the defendants in their "official" capacities.  *Givens v. City of New York*, No. 11 Civ. 2568, 2012 WL 75027, at *3-4 (S.D.N.Y. Jan. 10, 2010) (citing *inter alia Spiegel v.*

---

[23] In general, the ADA forbids discrimination in three major areas.  Title I covers employment discrimination; Title II covers public services, programs, and activities; and Title III covers public accommodations. *Tennessee v. Lane*, 541 U.S. at 516-17.  In *Board of Trustees v. Garrett*, 531 U.S. 356, 374 (2001), the Court held that Title I of the ADA does not abrogate the State's Eleventh Amendment immunity.  In *Garrett*, Court distinguished between Title I claims and Title II claims.

*Schulmann*, 604 F.3d 72, 79 (2d Cir. 2010); *Parada v. Banco Indus. de Venezuela, C.A.*, No. 10 Civ. 0883, 2011 WL 519295, at *3-4 (S.D.N.Y. Feb. 15, 2011); *Corr. v. MTA Long Island Bus*, 27 F. Supp. 2d 359, 370 (E.D.N.Y.), *aff'd*, 199 F.3d 1321 (2d Cir. 1999) (unpublished opinion). *See also Fox v. State Univ. of New York*, 497 F. Supp. 2d 446, 449 (E.D.N.Y. 2007) (no individual liability under either Title I or Title II of the ADA); *Plumey v. New York State*, 389 F. Supp. 2d 491, 499 (S.D.N.Y. 2005); *Cerrato v. Durham*, 941 F. Supp. 388, 395 (S.D.N.Y. 1996).  If plaintiff in this case has stated an ADA claim, it must be asserted only against the defendants in their official capacities.[24]

In *Tennessee v. Lane*, the Court held that State defendants are immune from damage claims under Title II if the State's conduct does not independently violate the Fourteenth Amendment, and in *United States v. Georgia*, 546 U.S. 151, 158-59 (2006), the court extended the reasoning in *Tennessee v. Lane* to encompass claims by inmates against the state under Title II.  In this case, because there is no independent Fourteenth Amendment violation with respect to either the cell assignment or the visiting room situation, the State defendants are immune from suit.

Claims for declaratory and injunctive relief against State defendants in their official capacities are not specifically barred by the Eleventh Amendment. *Andino v.*

---

[24] For purposes of the ADA, only one defendant in his official capacity would be sufficient, because the ultimate party responsible for an ADA claim is the State of New York.

*Fischer*, 698 F. Supp. 2d 362, 380 (S.D.N.Y. 2010) (citing *inter alia Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009)).  However, when the problem sought to be remedied has ceased, and where there is no reasonable expectation that the wrong will be repeated, the claim is moot and may be dismissed because the court lacks subject matter jurisdiction. *Id.* (citing *Fox v. Bd. of Trs. of State Univ. of N.Y.*, 42 F.3d 135, 140 (2d Cir. 1994).  Plaintiff's transfer out of the facility will generally moot any claims for declaratory and injunctive relief against officials from that facility. *Id.* (citing *Verley v. Wright*, No. 02 Civ. 1182, 2007 WL 2822199, at *9 (S.D.N.Y. Sept. 27, 2009)).

In this case, plaintiff is no longer incarcerated at Upstate, and absent a reasonable expectation that the conduct will be repeated, plaintiff's claim for declaratory and injunctive relief would be moot.  However, plaintiff argues that he has been double-bunked at various facilities, and that there is a reasonable expectation that he will again be housed in a double cell.  In order to demonstrate this, he has submitted a declaration, authored by a DOCCS employee, filed in opposition to a motion for a preliminary injunction in another of plaintiff's actions in this District. (Dkt. No. 42-1, Ex. F).  The declaration, dated July 29, 2010, states that plaintiff was housed in a double cell at Clinton for approximately four days between May and June of 2010, but had been transferred to a single cell at Clinton. (*Id.*)  Plaintiff claims in this case that on August 24, 2010, when he was transferred from Clinton to Upstate,

he was again housed in a double cell, showing that the double-cell assignment can be imposed at various facilities within a short period of time.

From the amended complaint and from plaintiff's response to the motion to dismiss, it appears that plaintiff may be occasionally housed in a double-cell for a short period of time until he is transferred to a different cell assignment. Thus, for purposes of injunctive relief under the ADA, it is reasonable to assume, based on plaintiff's allegations, that plaintiff could be subjected to the same double celling conditions in the future. However, even assuming that plaintiff's transfer to a different facility does not render moot the claim for injunctive relief because plaintiff is often assigned temporarily to a double cell, the court finds that plaintiff has not stated an ADA claim with respect to his housing assignment.

The ADA affords disabled persons legal rights regarding access to programs and activities enjoyed by all, but does not provide a state inmate with a "general federal cause of action" for challenging his medical treatment. *See Carrion v. Wilkinson*, 309 F. Supp. 2d 1007, 1016 (N.D. Ohio 2004) (quoting *Galvin v. Cook*, CV-00-29, 2000 WL 1520231, at *6 (D. Ore. Oct. 3, 2000)). In this case, plaintiff alleges that he was improperly assigned to a bottom bunk. Although he claims that it caused him great pain to get up from his bed, he does not claim that he was denied access to any activity or program, or suffered discrimination because of his back

30

problem.[25]  The ADA is not the vehicle for his claims, and any ADA claim regarding his housing assignment may be dismissed for failure to state a claim.

Plaintiff also complains about the discomfort he experienced during visits with his wife at Upstate because he could not sit comfortably for six hours in the chairs, due to his back impairment.  Visitation while in prison is considered a privilege and not a right. *See Mateo v. Heath*, No. 11 Civ. 636, 2012 WL 1075836, at *3 (S.D.N.Y. March 29, 2012) (citations omitted).  Plaintiff in this case does not claim that he could not attend his visits, merely that he had difficulty sitting for six hours.  Plaintiff has not stated a claim that he was denied access to a program or activity because of his disability.  Thus, any ADA claims relating to plaintiff's visitation may be dismissed.

## V.   **Retaliation (Clinton)**

### A.   **Legal Standards**

In order to establish a claim of retaliation for the exercise of a First Amendment right, plaintiff must show first, that he engaged in constitutionally protected speech or conduct, and second, that the protected activity was a substantial motivating factor for

---

[25] In an effort to come within the purview of the ADA, plaintiff claims he was "denied the benefit of a single cell." (AC at 17, ¶ (e)).  However, there is no "benefit" to a single cell.  Neither plaintiff, nor any other inmate has the right to a single cell, and plaintiff is not being denied a single cell because of his disability. *See Jarecke v. Hensley*, No. 2009 WL 2030394, at *8 (D. Conn. July 9, 2009) (citing *inter alia Rhodes v. Chapman*, 452 U.S. 337, 347 (1981) (holding that double celling inmates did not rise to the level of a constitutional violation).  Other inmates do not get to choose what cells they occupy.  Additionally, it has been held that New York has not created a liberty interest in single cell housing. *Bolton v. Goord*, 992 F. Supp. 604, 630 (S.D.N.Y. 1998).  Thus, plaintiff cannot state an ADA claim by alleging that he is being denied a "benefit" that is being given to others without plaintiff's disability.

"adverse action" taken against him by defendants.  *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (citing *Gayle v. Gonyea*, 313 F.3d 677 (2d Cir. 2002); *see also Hendricks v. Coughlin*, 114 F.3d 390 (2d Cir. 1997)).  Third, the plaintiff must establish a causal connection between the protected speech or conduct and the adverse action.  *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004).

There is no question that filing grievances qualifies as a "constitutionally protected" activity.  *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996).  The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'"  *Gill v. Pidlypchak*, 389 F.3d at 381 (citation omitted).  This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights.  *Id.*

### B.    Application

#### 1.    Verbal Harassment

Plaintiff appears to allege that "defendants" retaliated against him because he filed a grievance against defendant Leon.  Plaintiff claims that the "corridor Officer" told him that plaintiff was going to lose his grievance because "defendant Leon was well-liked," and that filing grievances at Clinton "would cause a lot of problems." (AC at 6, ¶ (j)).  Plaintiff then claims that one or two weeks after the grievance hearing, a "hall Officer" gave plaintiff a difficult time about having a permit for his wedding

band as plaintiff was on his way to visit with his wife. (AC at 7, ¶¶ (k)-(l)).  Although plaintiff states that he tried to explain that his "permit" was on "file" in the package room, and that he never had to take it off before, the officer allegedly sent plaintiff back to his cell to take off the ring, telling plaintiff that "this was only the beginning" because he liked to write grievances.

The court first notes that neither the "Corridor" officer, nor the "Hall" officer are named, and neither are defendants in this action.  The fact that plaintiff was inconvenienced by having to go back to his cell and take off his wedding ring is certainly not conduct that would deter a reasonable inmate from making complaints. Plaintiff claims that he wrote a grievance about the hall officer's conduct, and told the grievance officer that he *believed* that the officer's conduct was retaliatory.  The grievance sergeant told plaintiff "that was how things work in Clinton Annex."[26] (AC at 7, ¶ (n)).

Although there are other allegations of harassment by defendant Lincon (who has been dismissed from this action) and delays in visiting privileges, none of this conduct would be sufficient to rise to the level of actionable retaliation.  (AC at 8, ¶¶ (o)-(q)).  Even if plaintiff had been *denied* his visit on one occasion,[27] it would not rise

---

[26] The Sergeant could have been referring to the necessity for carrying the wedding ring permit.  However, plaintiff has interpreted this statement as an admission of "retaliation."

[27] Plaintiff makes no such claim.

33

to the level of "adverse action" for purposes of the retaliation analysis. *Mateo v. Heath*, 2012 WL 1075836, at *4.  In *Mateo*, the district court also held that plaintiff had failed to come forward with the "detailed fact pleading" required to support his claim that the denial of visitation was causally connected to any filed grievance. (*Id.*)  The same is true in this case.  There are no allegations indicating either that this conduct is adverse action, or that two unnamed officers would have known about plaintiff's grievance against defendant Leon.

### 2.   False Misbehavior Reports

A prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process.  *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986).  However, if the defendant initiated disciplinary proceedings against plaintiff in retaliation for his exercise of a constitutionally protected right, substantive due process rights are implicated even if the plaintiff was entitled to, and did receive, full procedural due process.  *Franco v. Kelly*, 854 F.2d 584, 588-89 (2d Cir. 1988).  Any action taken by a defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim.  *Id.*

Plaintiff claims that he was the subject of two false misbehavior reports, and that he was not afforded due process at the resulting disciplinary hearings.  Although

34

it is unclear from the amended complaint, in his response to the motion to dismiss,

plaintiff makes it quite clear that he is also claiming that the allegedly false

disciplinary reports were in retaliation for his grievances. (Dkt. No. 42-1 at 12-13,

¶¶ (1)-(3)).  It also appears from plaintiff's exhibits that one of the disciplinary

hearings was ultimately reversed, while the other one survived plaintiff's challenges.[28]

(Dkt. No. 42-1, Exs. H).  Plaintiff claims that his due process rights were violated at

both hearings.  At this stage of the case, and based in part on the fact that one of the

hearings was reversed, the court will not recommend granting a motion to dismiss on

the retaliation claim, relating to the disciplinary charges only.[29]

## VII.  Due Process

### A.   Legal Standards

To begin a due process analysis, the court must determine whether plaintiff had

a protected liberty interest in remaining free from the confinement that he challenges,

---

[28] In the amended complaint, plaintiff claims that "both misbehavior reports were appeal[ed] to defendant Prack, who affirmed all the charges even though established case law supports plaintiff's arguments." (AC at 12, ¶ (a-1)).  However, this allegation is inconsistent with plaintiff's Ex. H, which is the review of the August 5, 2010 (plaintiff says August 2, 2010) hearing.  Plaintiff's Exhibit H shows defendant Prack *administratively reversing* the August 5, 2010 Superintendent's Hearing on July 6, 2011. (Dkt. No. 42-1 at 21, Pl.'s Ex. H).  Also attached to Exhibit H is a decision by the Appellate Division, Third Department, dated July 27, 2011, dismissing as moot plaintiff's Article 78 proceeding, which challenged a disciplinary hearing, because the hearing had been administratively reversed. (*Id.* at Ex. H, Dkt. No. 42-1 at 23-24).  It also appears that the other disciplinary hearing may have survived plaintiff's challenge because plaintiff filed a grievance, alleging that he was held in SHU past his release date. (*See* Dkt. No. 42-1 at 36, 38, Pl.'s Exs. N (grievance), O (response to grievance)).

[29] This court makes no assessment of the ultimate merits of the plaintiff's retaliation claim.

and then determine whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001); *Bedoya v. Coughlin*, 91 F.3d 349, 351 (2d Cir. 1996).

In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . , nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

The Second Circuit has explicitly avoided a bright line rule that a certain period of confinement in a segregated housing unit ("SHU") automatically gives rise to due process protection. *See Sims v. Artuz*, 230 F.3d 14, 23 (2d Cir. 2000); *Colon v. Howard*, 215 F.3d 227, 234 (2d Cir. 2000). Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. *Palmer v. Richards*, 364 F.3d 60, 64-66 (2d Cir. 2004). A confinement longer than an intermediate one, and under "normal SHU conditions" is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*." *Colon v. Howard*, 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305-day confinement). Shorter

confinements under normal SHU conditions may not implicate a prisoner's liberty interest.

However, "SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions . . . or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer v. Richards*, 364 F.3d at 65 (citations omitted).  In the absence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short–*e.g.*, 30 days–and there was no indication that the plaintiff endured unusual SHU conditions.  *Id*. at 65-66 (collecting cases).

The due process protections afforded inmates facing disciplinary hearings that affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citing, *inter alia*, *Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974)).  The hearing officer's findings must be supported by "some" "reliable evidence." *Id.* (citing, *inter alia*, *Superintendent v. Hill*, 472 U.S. 445, 455 (1985)).

Violations of state regulations with respect to disciplinary hearings do not, by themselves, necessarily rise to the level of constitutional violations.  *See, e.g., Soto v.*

37

*Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (state law violation does not necessarily rise to the level of a constitutional violation)*; Young v. County of Fulton*, 160 F.3d 899, 902 (2d Cir. 1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred).  To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural deficiencies, in the sense that the errors affected the outcome of the hearing.  *See, e.g., Clark v. Dannheim*, 590 F. Supp. 2d 426, 429-31 (W.D.N.Y. 2008) (citing, *inter alia*, *Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir.1991) ("it is entirely inappropriate to overturn the outcome of a prison disciplinary proceeding because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial").

## B.   Application

In this case, defendants cite the amended complaint, in which plaintiff alleged that he was sentenced to SHU for 90 days, and argue that 90 days is insufficient to establish a liberty interest.  A review of the amended complaint shows that plaintiff also alleged a loss of good time as the result of one of the disciplinary hearings. (AD at 11, ¶ (z)).  In his response to the motion, plaintiff adds that he was held longer than 90 days, and argues that a liberty interest was created.  Plaintiff has submitted the hearing officer's decision, dated August 5, 2010. (Dkt. No. 42-1, Pl.'s Ex. C1).  It is clear from the document that plaintiff was sentenced to 90 days SHU, and the hearing

officer also recommended loss of two months good time. (*Id.*)  The loss of good time

creates a liberty interest because the length of plaintiff's incarceration is implicated.[30]

*Wolff v. McDonnell*, 418 U.S. 556-57 (1974).  Thus, plaintiff did have a protected

liberty interest, and the court may not grant defendants' motion to dismiss on that

basis.[31]

     **WHEREFORE**, based on the findings above it is

     **RECOMMENDED**, that defendants' motion to dismiss (Dkt. No. 37) be

**GRANTED**, and the complaint dismissed in its entirety without prejudice as to

---

[30] In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court held that a liberty interest is implicated in SHU confinement where the confinement imposes an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.  Courts look to the "actual" punishment imposed in making that determination. *Scott v. Albury*, 156 F.3d 283, 287 (2d Cir. 1998). The court also notes that there is no issue in this case that the action is premature under *Heck v. Humphrey*, In *Heck v. Humphrey*, 512 U.S. 477 (1994), the Supreme Court held that a section 1983 action, seeking damages is not cognizable if a decision in favor of the plaintiff would necessarily invalidate a criminal conviction unless the conviction or sentence had been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal, or called into question by a federal habeas court. 512 U.S. at 486-87.  *Edwards v. Balisok*, 520 U.S. 641 (1997) extended the rationale in *Heck* to section 1983 challenges to prison disciplinary proceedings in which a decision in plaintiff's favor would necessarily reverse the administrative decision revoking a plaintiff's good-time credits, thereby affecting the length of the plaintiff's confinement. 520 U.S. at 644.  In this case, *Heck* and *Balisok* do not preclude plaintiff's due process claim because it appears that the disciplinary hearing in which plaintiff lost good time was reversed on appeal, making the case ripe for section 1983 review.

[31] The hearing officers are defendants Eggleston and Maskunas.  Those are the only named defendants personally responsible for defendants' due process claims. It is unclear what happened after the second disciplinary hearing, although it appears that plaintiff lost only privileges as the result of the second hearing.  Unlike the first disciplinary hearing conducted by defendant Eggleston, plaintiff does not include any of the documents associated with the second hearing that was conducted by defendant Maskunas.  The second hearing was apparently not reversed, but plaintiff suffered no loss of good time and appears to have only suffered a loss of privileges.  Without furthr information, the court cannot determine whether a liberty interest was implicated with respect to the second hearing; however, the court will not recommend dismissing either claim at this time.

**DEFENDANTS FISCHER, KNAPP-DAVID, ROCK, and RABIDEAU**, and it is

    **RECOMMENDED**, that defendants motion to dismiss (Dkt. No. 37) be

**DENIED** as to **DEFENDANT LEON**, only with respect to the medical diet claim,

and it is

    **RECOMMENDED**, that defendants' motion to dismiss (Dkt. No. 37) be

**DENIED** as to defendants **EGGLESTON, MASKUNAS, PRACK, WHALEN, and**

**CHASE**, only with respect to plaintiff's Due Process and First Amendment claims,

relating to plaintiff's allegations of retaliatory false misbehavior reports and due

process violations at the disciplinary hearings.

    Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have

fourteen (14) days within which to file written objections to the foregoing report.

Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT**

**TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE**

**APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing

*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28

U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: May 1, 2012

Hon. Andrew T. Baxter
U.S. Magistrate Judge