# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

---

MICHAEL JONES,

                     Plaintiff,

         vs.                            9:10-CV-1331
                                           (GLS/ATB)

BRIAN FISCHER, DAVID ROCK,
*et al.*,

                     Defendants.

---

MICHAEL JONES, Plaintiff, *pro se*
KRISTA A. ROCK, Asst. Attorney General for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

# REPORT-RECOMMENDATION

This matter was referred to me for Report and Recommendation by the

Honorable Gary L. Sharpe, Chief United States District Judge, pursuant to 28 U.S.C. §

636 (b) and Local Rules N.D.N.Y. 72.3(c).

## I.   <u>Background</u>

In his amended civil rights complaint, plaintiff alleged that defendants violated

his rights to proper medical care, due process, and his right to be free from cruel and

unusual punishment. (Dkt. No. 5).  Defendants initially made a motion to dismiss,

based upon their allegation that plaintiff had "three strikes" pursuant to 28 U.S.C.

§ 1915(g) and therefore, should not be entitled to proceed in forma pauperis. (Dkt. No.

32).  The defendants' motion was rendered moot when plaintiff paid the filing fee on

December 1, 2011.

On December 19, 2011, defendants filed a second motion to dismiss for failure

to state a claim, addressed to the merits of the amended complaint. (Dkt. No. 37). On May 1, 2012, I recommended granting the motion in part, and on May 23, 2012, Chief Judge Sharpe adopted my recommendation, dismissing some, but not all of plaintiff's claims. (Dkt. Nos. 44, 45). On December 28, 2012, the remaining defendants filed a motion for summary judgment, pursuant to Fed. R. Civ. P. 56, addressed to the remainder of the amended complaint. (Dkt. No. 54). Plaintiff has responded in opposition to the motion, and defendants filed a reply. (Dkt. Nos. 56, 59).

The remaining claims are as follows:

(1)     An Eighth Amendment claim regarding plaintiff's medically prescribed diet against defendant Leon only.

(2)     Due process and First Amendment retaliation claims with respect to allegedly false misbehavior reports and two disciplinary hearings against defendants Eggleston, Meskunas, Prack, Whalen, and Chase.

For the following reasons, this court agrees with defendants and will recommend dismissal of the entire complaint against all remaining defendants.

## DISCUSSION

## II.    <u>Summary Judgment</u>

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must

be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin v. Goord*, 467 F.3d at 272.

Although the court briefly discussed the facts in its prior Report-Recommendation (Dkt. No. 44), additional evidence has been added to the record, in support of the summary judgment motion,[1] in the form of affidavits, documents

---

[1] Defendants' original motion was to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). Such a motion is directed to the face of the complaint. The court may also consider documents or exhibits that are attached to the complaint or incorporated by reference. *See Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment). With a motion for summary judgment, the court may consider additional evidence beyond the complaint to determine whether there are no disputed questions of material fact and whether summary judgment for either party is appropriate, as stated in the standard set forth above. *See* Fed. R. Civ. P. 56(c)(1) – (4).

relating to the claims, and plaintiff's deposition of September 28, 2012. (Dkt. No. 54-1 – 54-12). Thus, the court will discuss the additional facts as relevant to the issues raised in the pending motion.

## III. <u>Medical Diet</u>

### A. Facts

In the amended complaint, Plaintiff claims that on June 14, 2010, while he was incarcerated at Clinton, defendant Leon told plaintiff that he was removing plaintiff's name from the "special diet meal list." (Amended Complaint (AC) at 6, ¶ (h)).[2] Plaintiff alleges that when he asked why he was being removed from this list, defendant Leon stated that plaintiff knew why, and it was because "'I was [sic] you eating toast.'"[3] (*Id.*) Plaintiff claims that his "special diet" was low sodium, based upon plaintiff's high blood pressure. As a result of his removal from the diet, plaintiff states that he experienced headaches and dizziness. (*Id*. at 6, ¶ (i)) When he went to the facility clinic, he was allegedly told that due to his elevated blood pressure, he would have to be monitored to determine whether he should be placed on medication. (*Id.*) Plaintiff filed a grievance against defendant Leon. (*Id.* at 6 (j)).

During his deposition, plaintiff testified that he was first placed on a special low

---

[2] Plaintiff has numbered the pages of his amended complaint at the bottom. He has also identified paragraphs on each page by letter. However, plaintiff begins each cause of action with a new set of letters, beginning with ¶ (a). Thus, to properly cite to the amended complaint, the court will first cite the bottom page of the document and then cite to the lettered paragraph in which the cited facts are stated.

[3] Other documents in the record have clarified that there is a typographical error in the amended complaint. It is apparent that plaintiff meant that defendant Leon "saw" plaintiff eating toast.

sodium diet due to his "above normal" blood pressure when he was incarcerated at Shawangunk Correctional Facility. (Pl.'s Dep. at 15)[4] (Dkt. No. 54-9; Rock Decl. Ex. B). Plaintiff stated that his blood pressure was not "too high," and that the special diet helped "somewhat." (*Id.* at 17). Plaintiff was on the special diet while he was incarcerated at Eastern, Clinton, Upstate, and Coxsackie Correctional Facilities. (*Id.* at 18).

The incident with defendant Leon took place while plaintiff was confined at Clinton Correctional Facility. Plaintiff testified that defendant Leon was one of the "head cooks" at the Clinton Annex. On June 14, 2010, plaintiff states that he came into the mess hall for breakfast, and as he was "on the line getting close to receiving [his] tray, he saw an officer speaking to defendant Leon, and pointing at plaintiff. (*Id.* at 20, 22). After plaintiff sat down with his tray, defendant Leon walked over to plaintiff and asked whether his name was "Jones." (*Id.* at 20). Plaintiff acknowledged that he was Jones, and defendant Leon walked away. (*Id.*)

Plaintiff testified that when he came back for the lunch meal, he went to the diet line to pick up his tray, but was told that he was no longer on the list for the special diet. Plaintiff stated that when he asked defendant Leon why, he said "'You know what you did.'" (*Id.*) Plaintiff testified that he "never could figure out why he took my name off the diet list." (*Id.* at 22). During the deposition, plaintiff stated that he did not recall defendant Leon saying anything else. (*Id.* at 23). According to plaintiff, the

---

[4] The deposition transcript has its own numbered pages which are different than the page numbers assigned by the court's CM/ECF system. The court will use the pages that are on the deposition transcript itself.

only difference between the special diet and the regular meal was the sodium content. (*Id.*)

Plaintiff acknowledged that in order to participate in a special diet program, he had to sign a "contract," agreeing to certain things. (*Id.* at 24). When asked whether he could "trade food with other inmates," plaintiff stated that it depended on the kind of food, and that although he was allowed to eat bread, he could not eat bread with butter. (*Id.*) Plaintiff testified that he never cheated on the diet, and he never traded food with any inmates. (*Id.* at 26).

Plaintiff testified that later on in the day, he became dizzy, so he sought medical attention by putting himself on the list for sick call. (*Id.* at 27). Plaintiff stated that when he told the nurse about his symptoms, she took his blood pressure and noticed that it was elevated. (*Id.* at 28). Plaintiff told the nurse that he had been removed from the special diet, and the nurse made plaintiff an appointment to see a doctor. (*Id.* at 29). Plaintiff testified that when he saw the doctor, he told plaintiff that he was going to put him back on the special diet. (*Id.*) Plaintiff states that he was off of the diet for about a month. (*Id.* at 30). When asked whether he knew the procedure to put an inmate back on a special diet list, plaintiff stated that it depended on the "circumstances [of] the removal." (*Id.*)

Plaintiff testified that he filed a "basic inmate" grievance about his removal from the diet, but that he also wrote to the medical health director in Albany and the Commissioner of the Department of Corrections and Community Services ("DOCCS"). (*Id.*) When asked what he thought defendant Leon did "wrong," plaintiff

stated that defendant Leon

> had no authority to remove me from the diet, he wasn't a
> doctor and he's a cook, so that was outside of his
> jurisdiction. The only thing he should have done was
> reported me to the doctor, let them [sic] make a decision
> [sic] what they was [sic] going to do if something occurred
> that wasn't supposed to happen.

(*Id.* at 31).  Defense counsel asked plaintiff: "Is that why you're suing Leon?"

Plaintiff answered: "Yes, it is." (*Id.*)  When plaintiff was asked if defendant Leon did

anything else to violate plaintiff's constitutional rights, plaintiff stated that he could

not answer the question because he had not completed discovery. (*Id.*)

Defendant Leon has filed an affidavit, together with exhibits, in support of the

summary judgment motion. (Dkt. No. 54-4; Leon Aff.)  Defendant Leon states that he

is the Head Cook at Clinton and has held that position since 2007, overseeing the

preparation and distribution of food for 2,800 inmates, including those inmates who

are medically-ordered therapeutic diets. (Leon Aff. ¶ 2).  He is responsible for

ensuring that the appropriate quantities of food are available to the inmates and for the

prevention of waste. (*Id.*)  Therapeutic diets "generally involve a modification of

servings of food items from the general facility menu." (*Id.* ¶ 4).

Inmates who receive a therapeutic diet get their food trays by going through a

separate diet line, and each food tray is individually prepared for the inmate by a food

server in order to meet the requirements of the particular diet. (*Id.* ¶ 5).  Inmates are

required to comply with their therapeutic diets, and the diets are treated the same as if

they were a prescription for medication.  There is also a presumption that the inmate is

eating the appropriate food because the diets are monitored.  If an inmate eats only

intermittently, or does not eat, the tests used to monitor the inmate's condition will not provide the physician with a correct appraisal of the effect of the diet on the inmate's condition. (*Id.* ¶ 6). The failure of an inmate to follow his diet also creates problems for the food service personnel, who must serve 2,800 inmates per day, while maintaining quality and preventing waste. Therapeutic meals are prepared for individual inmates, pursuant to a prescription, and if the meals are not eaten, they must be thrown away. (*Id.* ¶ 7).

On June 1, 2010, a "Controlled A" diet was ordered for plaintiff by his doctor. (Leon Aff. ¶ 8 & Ex. A). A "Controlled A" diet consists of enhanced fiber, low fat, low cholesterol, and low sodium foods.[5] (*Id.*) In order to participate in the diet, plaintiff signed the "Therapeutic Diet Request Form and Attendance Agreement," which states that attendance is mandatory, his eating would be monitored, and if he did not comply with the diet, he could be subject to disciplinary action or removal from the program, "or both." (*Id.* ¶ 9 & Ex. A). The agreement is signed by plaintiff and witnessed by a nurse. (*Id.* Ex. A).

The Therapeutic Diet Meal Attendance policy is attached to defendant Leon's affidavit. (Leon Aff. Ex. B at 17). The policy states that non-compliance with the meal plan or failure to participate in three diet meals per week is a violation of the attendance policy. Violation of the attendance policy can result in counseling, removal from the diet meal program or disciplinary action. (*Id*). Inmates are expected to accept their trays and "avoid food swapping." (*Id.*) The policy also states that

---

[5] Plaintiff's testimony that the only difference between the standard inmate diet and his therapeutic diet was the sodium content was not accurate. (*See* Pl.'s Dep. at 23).

> Health Services will be notified in writing by the food
> service supervisor when diet meal service has been
> discontinued due to attendance policy violation.
> Discontinuance of the therapeutic meals due to non-
> compliance should be documented in the medical record.

(*Id.*)  One of defendant Leon's responsibilities as Head Cook is to monitor the

inmates' compliance with their special diets. (Leon Aff. ¶ 12).  Defendant Leon states

that he is required to report any incidents of non-compliance to his supervisor, Food

Administrator ("FA") David Timmons. (*Id.*)  FA Timmons then relays that

information to the Director of Health Services, who ultimately makes the

determination of whether the inmate should be "removed from the diet." (*Id.* ¶ 13).

Defendant Leon states that on June *15*,[6] 2010, he saw plaintiff exchanging and

taking other inmates' "regular" food, which "constituted non-compliance" with his

"therapeutic diet regimen." (Leon Aff. ¶ 14). As a result, on the same day, defendant

Leon wrote a note to his supervisor, FA Timmons, informing him of the plaintiff's

violation. (*Id.* ¶ 15 & Ex. C).  FA Timmons would then be responsible for sending the

information to the Director of Health Services. (*Id.*)  Defendant Leon states that the

"*actual cancellation* of a therapeutic diet can only be approved and effectuated by the

Director of Health Services." (*Id.* ¶ 16) (emphasis added).  Sometimes the inmate is

---

[6] Plaintiff now disputes the date of the incident.  In his response to the motion for summary judgment, he states that the incident occurred on July 14, 2010 at breakfast, not on July 15, 2010 at lunch time. (Dkt. No. 56 at 4).  First, plaintiff must mean "June" not "July," and second, plaintiff's own exhibit indicates that the date was June 15, 2010. (Dkt. No. 56-1, Ex. A).  The Inmate Grievance Complaint is dated *June 15, 2010*, and the first sentence states that "*on the above date*, I went to the *noon* meal and was told be Cook Colos [sic] that he has removed my name off the diet list." (*Id.*) (emphasis added).  Because plaintiff's own exhibits contradict his statement regarding the date and time of the incident, there is no question of fact, even if such a dispute would have made a difference.

9

"removed" from his special diet, sometimes he is not. (*Id.*)  Defendant Leon states that in reporting plaintiff's non-compliance, he was not acting with any malicious intent or deliberate indifference. (*Id.* ¶ 18).

FA Timmons[7] has also submitted an affidavit, which includes the documents generated by plaintiff's grievance related to this incident. (Timmons Aff. Ex. B; Dkt. No. 54-10).  FA Timmons confirms in his affidavit, that defendant Leon properly reported plaintiff's non-compliance with the therapeutic meal plan on the same day that the violation occurred. (Timmons Aff. ¶ 26 & Ex. C).  Plaintiff filed his grievance on June 17, 2010, two days after the incident. (*Id.* Ex. C at 2).

On June 17, 2010, during the grievance investigation, defendant Leon stated in a memorandum to Nancy Rattlif, Inmate Grievance Supervisor, that "I saw inmate Jones . . . exchanging and taking other inmates [sic] regular food on 6-15-2010, this puts him on [sic] violation of his diet contract." (*Id.* Ex. C at 7).  The Inmate Grievance Resolution Committee ("IGRC") responded that the "cook" stated that plaintiff was observed exchanging and taking other inmates' regular food "and removed him from diet." (*Id.* Ex. C at 9).  The "dissenting" opinion stated that "removing from medical diet should only be done by medical personnel." (*Id.*)  Plaintiff appealed, indicating that he wished to be put back on the diet, and the Superintendent "granted" plaintiff's request on July 15, 2010, stating that "[o]nly the medical provider may remove an inmate from a therapeutic diet."[8] (*Id.* Ex. C at 5).

---

[7] FA Timmons has not named as a defendant in plaintiff's action.

[8] One of plaintiff's exhibits shows that he was placed back on the therapeutic diet on July 17, 2010. (Pl.'s Resp. Ex. B; CM/ECF p.7).

Although it is unclear why a favorable result would be appealed, plaintiff appealed the Superintendent's decision to the Central Office Review Committee ("CORC").[9] The CORC's decision is dated October 6, 2010, "accepts" the action requested "in part," and indicates that it considered the facts and circumstances of the case, including the "recommendation of the Division of Health Services." (*Id.* at 1). The CORC confirmed that plaintiff was observed trading food while on the diet "and was appropriately removed in accordance with the signed contract." (*Id.*) Plaintiff was cautioned to "comply" with the contract in the future to avoid "similar difficulties." The CORC found insufficient evidence to substantiate malfeasance by the staff and noted that plaintiff had been transferred. (*Id.*)

In response to defendants' motion for summary judgment, plaintiff has submitted a variety of medical records, many of which contain blood pressure measurements, in an attempt to argue that the removal from his therapeutic diet caused his blood pressure to be permanently elevated such that he was no longer able to control it with diet alone. (Pl.'s Exs. I, J, K, J-2).

## B. Legal Standards

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently

---

[9] The "Appeal Statement" says only "see body of grievance." (Timmons Aff. Ex. C at 5). The body of the grievance states that plaintiff wishes to be placed back on the special diet list and "no retaliation" be commenced as a result of the grievance. (*Id.* at 6). It is possible that plaintiff appealed because the Superintendent's decision did not address the issue of retaliation. The CORC did address that issue, stating that it is against DOCCS regulations to retaliate against inmates for good faith use of the grievance procedure, and if an inmate feels that he has been the subject of retaliation he "may pursue a complaint that reprisal occurred through the grievance mechanism." (*Id.*)

harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter*, 316 F.3d 178, 183–84 (2d Cir. 2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing inter alia *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.'" *Bellotto v. County of Orange*, 248 F. App'x 232, 236 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id*. at 185. The standard for determining when a deprivation or delay in a prisoner's medical need is sufficiently serious, contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto v. County of Orange*, 248 F. App'x at

236 (citing *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir.1998) and *Smith v. Carpenter*, 316 F.3d at 187 (actual medical consequences are highly relevant)).

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id*. at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan*, 511 U.S. at 844. Thus, the court stated in *Salahuddin*, that the defendant's believe that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin*, 467 F.3d at 281.

The denial of a medically prescribed diet may, under certain circumstances, rise to the level of an Eighth Amendment violation. *Abdush-Shahid v. Coughlin*, 933 F. Supp. 168, 180 (N.D.N.Y. 1996) (citing *Robles v. Coughlin*, 725 F.2d 12, 15-16 (2d Cir. 1983); *Mandala v. Coughlin*, 920 F. Supp. 342, 353 (E.D.N.Y. 1996); *Johnson v. Harris*, 479 F. Supp. 333, 336-37 (S.D.N.Y. 1979)). The objective component

13

requires the plaintiff to show evidence of some adverse health impact cause by the discontinuance or failure to provide the special diet. *Hall v. County of Saratoga*, No. 1:10-CV-1120, 2013 WL 838284, at *7 (N.D.N.Y. Mar. 6, 2013) (citing *Davidson v. Desai*, 817 F. Supp. 2d 166, 190 (W.D.N.Y. 2011)). The subjective, deliberate indifference, component must be demonstrated by proof that corrections personnel intentionally denied access to, or interfered with the prescribed treatment. *Abdush-Shahid v. Coughlin, supra.* The plaintiff also has a duty to inform staff that he is not receiving his medically prescribed diet, and if he fails to do so, deliberate indifference does not exist. *Evans v. Albany County Correctional Facility*, No. 9:05-CV-1400, 2009 WL 1401645, at *9 (N.D.N.Y. May 14, 2009) (citing *LaBounty v. Gomez*, No. 94 Civ. 3360, 1998 WL 214774, at *2 (S.D.N.Y. May 1, 1998)).

## C.    Application

The plaintiff was prescribed the "Controlled A" diet, consisting of enhanced fiber, low cholesterol, and low sodium. It is clear that plaintiff did not receive his therapeutic diet for approximately one month between June 15 and July 15 of 2010.

Plaintiff signed an agreement that he would not deviate from the diet and would not miss meals. He was well aware that the failure to do so could result in counseling, removal from the diet, and/or disciplinary action.[10] The evidence submitted shows that on June 15, 2010, defendant Leon reported to his supervisor, FA Timmons, in writing, that plaintiff was in violation of his special meal agreement. The handwritten

---

[10] Plaintiff has signed several of these "contracts." The earliest one submitted by plaintiff is dated June 26, 2009. (Pl.'s Ex. L at CM/ECF p.44). Plaintiff has also submitted requests dated September 8, 2009; December 17, 2009; June 1, 2010; August 25, 2010; and November 5, 2010. (*Id.* at CM/ECF pp. 39-43).

note at the bottom of the "Interdepartmental Communication" form states that "[the] inmate was eating [a] regular meal." (Leon Aff. Ex. C). Plaintiff testified that he did not know why defendant Leon took his name off the list, but at one point, states that defendant Leon told plaintiff that he was seen eating toast.

Plaintiff argues that because he was off of his diet for "so long," his blood pressure went so high that he could no longer monitor it with diet, and he had to be prescribed medication. However, plaintiff sought medical attention from a nurse "the next day" after his name was taken off the list because he was allegedly feeling dizzy. Plaintiff stated that when he went to sick call, "they" could see his blood pressure had gone up. (Pl.'s Dep. at 27-28). Plaintiff stated that the nurse told him that she would make an appointment for plaintiff to see his doctor, and the doctor said that he would put plaintiff back on the diet. (*Id.* at 29). Moreover, plaintiff filed a grievance two days after the incident, which was immediately investigated. On July 15, 2010, he was placed back on the special diet. The court notes that July 15, 2010 was the same day that the Superintendent granted plaintiff's grievance.

Defendant Leon states that he saw plaintiff eating food that was not on the diet menu and reported the violation to his supervisor. If plaintiff were already eating foods that were not authorized on the diet, the fact that defendant Leon discontinued the diet meals did not affect plaintiff's health; his own violation of the diet rules was the cause of any problems.[11] Refusal to comply with proper treatment, including

---

[11] The court notes in passing that plaintiff has submitted copies of his medical records. On July 14, 2010, the day before he was placed back on the special diet, and when he had been off of the therapeutic diet for approximately one month, plaintiff's blood pressure was 129/83. (Pl.'s Ex. I at 1). One week after he started the diet again, his blood pressure was back up to 147/90 in one arm and

violations of the diet and the failure to attend meals according to the contract has been held to be sufficient to grant summary judgment in the defendant's favor. *See e.g. Abdush-Shahid*, 933 F. Supp. at 180 (plaintiff's removal from the special diet was not deliberate indifference where plaintiff refused to eat the special meals); *Hucks v. Artuz*, No. 99 Civ. 10420, 2003 WL 22019744, at *6 (S.D.N.Y. Aug. 22, 2003) (evidence that an inmate refuses to comply with medical treatment was sufficient for summary judgment); *Rivera v. Goord*, 253 F. Supp. 2d 735, 756 (S.D.N.Y. 2003) (citations omitted) (same).

There appears to have been no actual cancellation of plaintiff's special diet,[12] only a temporary discontinuance, apparently initiated by defendant Leon.[13] FA

---

146/96 in the other arm. (*Id.* at 2). The provider ordered a "BP med eval." In August of 2010, plaintiff's blood pressure was 139/92, and on October 21, 2010, his blood pressure was 118/64. (Pl.'s Ex. J-2 at CM/ECF pp.114, 117). On August 21, 2010, plaintiff's blood pressure was 139/92, and there was an order for a low sodium diet signed at Upstate Correctional Facility on August 25, 2010. (*Id.* at CM/ECF pp. 114, 115). While plaintiff had a few extremely high readings in August of 2011 (more than one year after this incident), after he was prescribed Catapress and another blood pressure medication, in September of 2011, his blood pressure readings were 120/86 and 138/85. (Pl.'s Ex. J at CM/ECF p. 29). On September 6, 2011, plaintiff complained that he had headaches associated with his blood pressure, but his blood pressure reading was 120/86 that day, and ten days later, on September 16, 2011, it was still relatively low. (*Id.* at CM/ECF p.29). There is no question that plaintiff has high blood pressure, which is poorly controlled from time to time. However, there is no evidence that defendant Leon's conduct in reporting plaintiff's violation of the therapeutic meal rules was the cause of any serious problems plaintiff experienced with his blood pressure.

[12] A diet "cancellation" would be registered on the same form as the diet request and attendance contract. There is a space on the form for a "DIET REQUEST" and a "DIET CANCELLATION." (Timmons Aff. Ex. A). The policy provides that if the diet order is cancelled, and the inmate's name is removed from the list, "documentation of the supporting reasons for cancellation or removal MUST be placed in the inmate's medical record." (Timmons Aff. Ex. B at 10). There is no such documentation in this record.

[13] Defendant Leon does not concede that he initially discontinued giving plaintiff his special diet, but there appears to be no question that plaintiff did not receive the therapeutic diet for one

Timmons states that the "actual cancellation" of a therapeutic diet can only be approved and effectuated by the Director of Health Services." (Timmons Aff. ¶ 27). Defendant Leon's only recourse was to report the violation to FA Timmons, which was done in this case.

There is no question that defendant Leon had no authority to **cancel** a diet request, and it is unclear whether he had the authority to discontinue the meals while cancellation was being contemplated by the Director of Health Services.[14]  The policy itself implies that a diet may be "discontinued," pending possible cancellation by Health Services. (Leon Aff. Ex. B at 17).  The policy states that Health Services will be *notified* in writing by the food service supervisor "when diet meal service has been *discontinued* due to attendance policy violation." (*Id.*) (emphasis added).  This sentence implies that "discontinuance" is different from "cancellation."  The diet is "discontinued" because of the violation, but then the medical department is notified and must then decide whether to "cancel" the therapeutic diet order.

Even assuming that defendant Leon had no authority to "discontinue" giving

---

month.  The grievance documents show that the IGRC stated that the "Cook stated Jones was observed exchanging [sic] taking other inates [sic] regular food on 6-15-10 which put him in violation of contract and *removed him from diet.* Must request reinstatement to diet meal with medical." (Leon Aff.,  Ex. B at 9) (emphasis added).  The "dissenting opinion" stated that "removing from medical diet should only be done by medical personnel." (*Id.*)  The investigative report on appeal, written by M. Ratliff, after interviewing defendant Leon, states that plaintiff "was observed exchanging and taking other inmates [sic] regular food on 6-15-10 which put him in violation of the diet contract and *he was removed from diet*." (*Id.* at 14) (emphasis added).  A meeting was scheduled with a doctor to "address this procedure," and on the next day, Deputy Superintendent of Programs ("DSP") Keysor wrote that "only medical will remove from diet. 3 missed meal - warning given - 2nd offense, medical *notified*." (*Id.*)

[14] The court notes that plaintiff's grievance was granted to the extent that he was ordered back on the diet because, according to the Superintendent's response, only the medical department could remove someone from the therapeutic diet.

plaintiff the special meals, and even if plaintiff's medical condition had been seriously impacted by the one-month interruption of his special diet, there is absolutely no indication that defendant Leon took the action he did with deliberate indifference to plaintiff's serious medical needs. The therapeutic meal policy specifically provides that an inmate may be put back on the program through the facility sick call procedures. (Timmons Aff. Ex. B at 17). Defendant Leon knew of the policy, and he sent his memorandum to defendant Timmons on the same day that the violation occurred. Thus, defendant Leon acted knowing that the medical staff would evaluate whether plaintiff needed to be placed back on the special diet for medical reasons. By requesting sick call and filing a grievance, plaintiff essentially asked to be placed back on the special diet within days of being advised by defendant Leon that plaintiff was no longer on the list. The length of time that plaintiff ultimately spent "off" of the diet was not under defendant Leon's control.[15] The court notes that the grievance investigation report implies that the procedure followed was discussed with "Dr. Johnson" and ultimately, it appears that plaintiff's grievance was granted because only medical personnel should be allowed to even "discontinue" giving inmates the

---

[15] Defendants argue that the "removal" from plaintiff's medical diet was caused by "someone else, namely the medical personnel who possessed the sole authority to effectuate that removal." (Def.'s Br. at 11) (Dkt. No. 54-12). However, FA Timmons states that he "would have" discussed the report with medical personnel who then "would have" made a determination of whether to cancel the diet. (Timmons Aff. ¶ 26). It is not clear from the affidavit that this is exactly what happened. FA Timmons states that sometimes an inmate is removed from the special diet and sometimes he is not. (*Id.* ¶ 28). FA Timmons also states that the Form 3273 is not used when addressing an issue of non-compliance with the Attendance Agreement: "that is an administrative matter handled between the Director of Food Services and the Director of Health Services." (*Id.* ¶ 29). Although it is unclear, this may mean that unless the diet is actually canceled by the Director of Food Services, no form is used, and there is no record of the action taken.

18

therapeutic diet.[16]

In *Collazo v. Pagano*, 656 F.3d 131, 135 (2d Cir. 2011), the court granted summary judgment in favor of a defendant who removed an inmate from the special meal program, finding that there was nothing in the record to indicate that the defendant had the requisite intent in either of two instances in which he asked for the plaintiff's special dietary status to be revoked. Each time that the defendant asked for a revocation of the inmate's dietary status, the defendant had determined that plaintiff had violated the rules of the mess hall or of the special diet itself. *Id.* In *Collazo*, once it was determined that the plaintiff's violations were the result of a misunderstanding, the special diet was restored.

Defendant Leon has presented evidence that he reported plaintiff's violation of the special diet, not to jeopardize his health, but in an effort to make sure that plaintiff properly participated in the therapeutic diet program. Plaintiff admits that he was seen in the medical department the day after his special diet was discontinued. Plaintiff's special diet was restored after plaintiff filed a grievance about the discontinuance. Plaintiff has not submitted any evidence or facts to rebut the defendant's showing. Therefore, summary judgment may be granted in favor of defendant Leon on the Eighth Amendment claim, given the complete lack of evidence suggesting that he acted with deliberate indifference to plaintiff's serious medical needs.

---

[16] The notation states "7/15/10 pe [sic] DSA Keysor - only medical *will remove* from diet." (Leon Aff. Ex. B at 14). It appears that the DSP was indicating that in the future, the procedure to follow was that after 3 missed meals, an inmate would be warned, and after the "2nd offense," the medical department would be notified. (*Id.*)

## IV.    Disciplinary Hearings/Retaliation

### A.    Facts

Defendants have included additional facts about plaintiff's due process and retaliation claims regarding his two disciplinary hearings.

### 1.    Threatening Letter

Plaintiff claims that on July 26, 2010, defendant Chase improperly confined plaintiff in the Special Housing Unit ("SHU") and issued a misbehavior report, charging him with threats, rioting, false statements, and impersonation. (AC ¶ 6-s). Defendant Chase has filed an affidavit stating that, as part of his duties as a Corrections Lieutenant, he investigates charges of serious misconduct by inmates. (Chase Aff. ¶ 5; Dkt. No. 54-2). Lt. Chase states that on July 23, 2010, he was Acting Captain at Clinton Annex, and one of his responsibilities was to open all mail addressed to Captain Holdridge. (Chase Aff. ¶ 8). On that date, defendant Chase opened a letter that was purportedly from an inmate named A. Alexander. The letter contained allegations against two corrections officers, and ended with a threat that the writer and "other inmates" in his housing unit would "'do all we have to do to get these officers off the unit.'" (*Id.* ¶ 9). A copy of the letter is attached to defendant Chase's affidavit as Exhibit A.

Defendant Chase brought the letter to the attention of Housing Sergeant Giambruno, and they began an investigation with the help of Corrections Counselor, defendant Laura Whalen. (*Id.* ¶ 10). Following an interview with inmate Alexander, they determined that he did not write the letter. Defendants then began comparing the

handwriting in the letter to the handwriting of other inmates in the unit, including

plaintiff. Similarities between plaintiff's handwriting and the handwriting in the letter

caused defendants Chase and Whalen to conclude that plaintiff was the true author of

the letter. Defendant Chase then wrote the misbehavior report and had plaintiff

confined to SHU on July 26, 2010, pending the Tier III disciplinary hearing. (Chase

Aff. ¶¶ 14-15 & Ex. C).

Defendant Chase denies that he took this action in retaliation for any grievance

written by plaintiff. (*Id.* ¶ 16). Defendant Chase alleges that the letter raised the

possibility of a serious threat to the safety and security of the facility, and he believed

that the investigation conducted by the officers "conclusively established" that

plaintiff was the author of the letter. (*Id.* ¶ 17). Defendant Chase states that, at the

time he wrote the misbehavior report, he was not aware that plaintiff filed grievances

against defendant Leon, Officer Lincoln, or any other individual. (*Id.* ¶ 19).

Defendant Chase states he had a good faith basis for writing the report, and plaintiff

was ultimately found guilty of the violation. (*Id.* ¶ 20). Defendant Chase states that he

is not, and has never been, involved with Clinton's food service program or with

plaintiff's special diet in any way. (*Id.* ¶ 22).

In his affidavit, defendant Chase also explains the method by which they

determined that plaintiff was the author of the letter, even though defendant Chase has

never taken a course in handwriting analysis. Defendants Chase and Whalen

compared the handwriting in the letter to the handwriting of eight porters in plaintiff's

housing unit. (Chase Aff. ¶ 26). The penmanship of each sample differed sufficiently

so that the samples could not be confused, and there was no need to distinguish among similar samples. (*Id.* ¶ 30). Defendant Whalen was plaintiff's counselor, was familiar with his handwriting, and concurred with defendant Chase's analysis. (*Id.*)

Defendant Whalen has also filed an affidavit in support of the summary judgment motion. (Whalen Aff.) (Dkt. No. 54-11). Defendant Whalen states that anonymous or forged notes are common in the prison environment, and it is often necessary to identify the authors. (Whalen Aff. ¶ 7). She saves all correspondence and any other documents that she receives from inmates, and she has been asked at times to participate in investigations involving the identification of an inmate's handwriting. (*Id.* ¶¶ 7-8).

On July 23, 2010, she was asked to assist defendant Chase and Lieutenant Giambruno in investigating the letter described above. Once the defendants determined that Alexander had not written the letter, they put together a list of porters housed in the same building for a comparison of their handwriting to the letter in question. After looking at a sample of plaintiff's handwriting, defendant Whalen determined that some of the characteristics in his writing were very similar to the threatening letter, but that the samples of the handwriting of other inmates in the unit did not match the letter. (Whalen Aff. ¶¶ 9-14).

The defendants then examined additional samples of plaintiff's handwriting and concluded that plaintiff was the true author of the letter. Defendant Whalen states that the comparison they conducted would not have required an expert in handwriting analysis, and it was "immediately obvious" that plaintiff's sample was the only one

that bore any resemblance to the handwriting in the threatening letter. (*Id.* ¶¶ 15-19). Defendant Whalen has participated in many such investigation and states that she is confident that defendants drew the correct conclusion about the author. (*Id.* ¶ 23).

The disciplinary hearing was held before defendant Eggleston, who at the time in question, was an Education Supervisor for DOCCS.[17] She was often asked to conduct Tier III disciplinary hearings. (Eggleston Aff. ¶ 2). She held the Tier III disciplinary hearing against plaintiff from July 29, 2010 through August 5, 2010. A copy of the transcript of the hearing is attached as Exhibit B to defendant Eggleston's affidavit. At the conclusion of the hearing, defendant Eggleston found plaintiff guilty of the charges and imposed a penalty of 45 days in SHU, plus 45 days from a previously suspended sanction, and included 90 days loss of privileges, together with a two month loss of good time. (Eggleston Aff. ¶ 11 & Ex. A at 1).

Defendant Eggleston states that she did not violate any of plaintiff's due process rights, she did not conduct an "off-the-record" conversation about the charges with defendant Chase, she agreed to show plaintiff the letter that he was accused of writing and to check on the availability of the letters used for comparison, but denied as unreasonable, plaintiff's request that she obtain writing samples from all inmates housed in plaintiff's unit. (*Id.* ¶¶ 20-23).

## 2. Phone Program Violation

Defendant Whalen filed a misbehavior report against plaintiff, dated July 27,

---

[17] Defendant Eggleston is currently retired. (Eggleston Aff. ¶ 2).

2010. (Whalen Aff. ¶ 25; Meskunas Aff. ¶ 4 & Ex. A).[18]  The misbehavior report states that on July 23, 2010, plaintiff was moved from Building 14 to Building 11-A2, pending an investigation.  A review of the telephone records showed that plaintiff had exchanged his personal identification number ("PIN") with another inmate in Building 14 so that plaintiff could circumvent his keeplock status.  Defendant Whalen states that this was established by records, showing that four telephone calls were made, using plaintiff's PIN, to a telephone number listed on his personal telephone list, belonging to "Anthony Mosley."  These calls were made after plaintiff was placed on keeplock status and could not have made the telephone calls. (Whalen Aff. ¶ 25; Meskunas Aff. ¶ 5 & Ex. A at 4).  The misbehavior report states that plaintiff gave his PIN to another inmate, who used the number to call Mr. Mosley–on plaintiff's telephone list–on plaintiff's behalf. *Id.*  Plaintiff was charged with a telephone program violation, exchanging PINs, and refusing a direct order. (Meskunas Aff. ¶ 4).

On July 28, 2010, plaintiff met with his employee assistant. (Meskunas Aff. ¶ 7 & Ex. A at 7).  Defendant Meskunas held a disciplinary hearing between August 2, 2010 and August 10, 2010, and a copy of the transcript of the hearing is attached to his affidavit as Exhibit B.  Defendant Meskunas refused to call Mr. Mosley as a witness for plaintiff. (Meskunas Aff. Ex. A at 5).  The denial was in writing and indicated that the requested witness could not give relevant evidence because the inmate who placed the call already testified. (*Id.* ¶¶ 16-18).  At the conclusion of the

---

[18] Although defendant Whalen states that her misbehavior report is attached to her affidavit as Exhibit C, there is no such exhibit in the record.  However, the misbehavior report has been attached to defendant Meskunas's affidavit in Exhibit A.  The court will cite to the copy in the Meskunas affidavit.

hearing, plaintiff was found guilty of two of the three charges.[19] (Meskunas Aff. Ex. A at 1). Defendant Meskunas imposed a penalty of two months loss of telephone and commissary privileges. (*Id.* ¶ 19 & Ex. A at 1-2). The determination was affirmed by defendant Prack. (Meskunas Aff. ¶ 20 & Ex. C).

## B. Legal Standard

### 1. Due Process

To prevail on a procedural due process claim under section 1983, a plaintiff must show that he possessed a protected property or liberty interest and that he was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir. 2000) (liberty interest); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir. 1998). Due process generally requires that a state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir. 2003).

In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . , nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." The Second Circuit has explicitly avoided a bright line rule that a certain period of SHU confinement automatically give rise to due process protection. See

---

[19] Plaintiff was found not guilty of the refusal to obey an order. (Meskunas Aff. Ex. A at 1).

*Sims v. Artuz*, 230 F.3d 14, 23 (2d Cir. 2000); *Colon v. Howard*, 215 F.3d 227, 234 (2d Cir. 2000). Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. *Palmer v. Richards*, 364 F.3d 60, 64-66 (2d Cir. 2004). A confinement longer than an intermediate one, and under "normal SHU conditions" is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*." *Colon*, 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305-day confinement). Although shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest, SHU confinements of fewer than 101 days may constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions. *Palmer v. Richards*, 364 F.3d at 65. In the absence of a detailed factual record, cases in this circuit typically affirm dismissal of due process claims in cases where the period of time spent in SHU was short–e.g., 30 days–and there was no indication that the plaintiff endured unusual SHU conditions. Id. at 65-66 (collecting cases).

If a liberty interest is found to exist, due process requires advance notice of the charges against the inmate and a written statement of reasons for the disposition. *Wolff v. McDonnell*, 418 U.S. 539, 563-64 (1974), The inmate should also have the ability to call witnesses and present documentary evidence, subject to legitimate safety and correctional goals of the institution. *Id*. at 566. Finally, the inmate is entitled to a fair and impartial hearing officer, and the hearing disposition must be supported by "some" or "a modicum" of evidence. *Superintendent v. Hill*, 472 U.S. 445, 455 (1985)

(some evidence standard); *McCann* v. Coughlin, 698 F.2d 112, 121-22 (2d Cir. 1983) (fair and impartial hearing officer). Violations of state regulations with respect to disciplinary hearings do not, by themselves, necessarily rise to the level of constitutional violations. *See Young v. County of Fulton*, 160 F.3d 899, 902 (2d Cir. 1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred); *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (state law violation does not necessarily rise to the level of a constitutional violation).[20]

### 2.    Retaliation

In order to establish a claim of retaliation for the exercise of a First Amendment right, plaintiff must show first, that he engaged in constitutionally protected speech or conduct, and second, that the protected activity was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (citing *Gayle v. Gonyea*, 313 F.3d 677 (2d Cir. 2002); *see also Hendricks v. Coughlin*, 114 F.3d 390 (2d Cir. 1997)). Third, the plaintiff must establish a causal connection between the protected speech or conduct and the adverse action. *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004).

There is no question that filing grievances qualifies as a "constitutionally protected" activity. *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that

---

[20] "While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation." *Samuels v. Selsky*, 01CIV.8235, 2002 WL 31040370, at *13 n.21 (S.D.N.Y. Sept. 12, 2002) (citing *Duckett v. Ward*, 458 F. Supp. 624, 627 (S.D.N.Y.1978)).

would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'" *Gill v. Pidlypchak*, 389 F.3d at 381 (citation omitted). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Bennett*, 343 F.3d at 137 (citation omitted). Accordingly, plaintiff must set forth non-conclusory allegations. *Id.* Even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.* (citing, *inter alia*, *Mount Healthy Sch. Dist. v. Doyle*, 429 U.S. 274, 287 (1977)).

## C.   Application

### 1.   Due Process

#### a.   Threatening Letter

Defendants first argue that plaintiff has failed to establish a liberty interest and that, in any event, he was afforded the requisite due process with respect to the disciplinary hearing.[21]  As a sanction for writing the letter in question, plaintiff received a 45-day term of confinement in SHU, the reinstatement of a prior suspended

---

[21] Defendant Prack, the Acting Director of Special Housing and Inmate Programs and Inmate Disciplinary Program also argues that plaintiff has not shown sufficient personal involvement by defendant Prack.  Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citation omitted); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). Because I find no constitutional violation in this case, I need not reach the issue of personal involvement.

45-day term, and a two month recommended loss of good time. The period of SHU confinement was 90 days. Defendant Eggleston also declined to give plaintiff credit for the time he spent in pre-hearing confinement from July 26, 2010 until the conclusion of the hearing. She ruled that his SHU time would begin to run on the date that the hearing concluded. The extra time could be considered additional confinement relating to the charges. Although defendant Eggleston also recommended a loss of good time, plaintiff is serving a life sentence and is not entitled to earn good time. (Prack Aff. ¶ 18 & Ex. B). Thus, the "deprivation" of good time credits did not affect plaintiff's term of imprisonment, and does not count toward creating a liberty interest in this case. The only sanction that the court may consider is the time that plaintiff spent in confinement as a result of these charges.[22] In his response to the motion for summary judgment, plaintiff alleges that he spent 106 days in SHU. (Pl.'s Resp. at 2) (Dkt. No. 56).

As stated above, typically, sanctions of SHU confinement of less than 101 days do not implicate a liberty interest protected by due process unless the conditions were more severe that "normal" SHU conditions. *Palmer, supra.* There is no indication in plaintiff's amended complaint that the conditions in SHU were any more severe than those experienced in SHU generally. In fact, plaintiff testified at his deposition that he received one hour per day recreation, got his meals, was able to have books, was able to have writing materials, and the same was true for the time he spent in SHU at

---

[22] Although in its Report, recommending denial of the defendants' motion to dismiss, this court found that plaintiff had a liberty interest in the first hearing, the court was not aware that plaintiff was unable to earn good time credits. (Dkt. No. 44 at 39).

Upstate in connection with this charge. (Pl.'s Dep. at 52-53). Thus, plaintiff did not have a liberty interest that was protected by due process in his first disciplinary hearing, even if plaintiff spent a few extra days in SHU, more than the 101 days cited in the case law. The plaintiff's due process claims could be dismissed on this basis, however, the court will also consider the merits.

Even assuming that plaintiff did have a liberty interest, he received all the process to which he was entitled. He argues that defendant Eggleston spoke to defendant Chase ex-parte for seven minutes prior to his testimony at the disciplinary hearing. In the amended complaint, plaintiff argued that defendant Eggleston denied him the right to review the eight samples that were used for comparison and did not make an independent appraisal of the evidence. Plaintiff claims that defendants Chase and Whalen are not handwriting experts and have no basis for finding that plaintiff's handwriting matched that of the letter. Plaintiff argued that defendant Eggleston improperly directed that plaintiff's SHU sentence should run from the conclusion of the hearing, rather than giving him credit for the time that he served in pre-hearing confinement. In his response to defendants' motion for summary judgment, he now argues that defendant Eggleston violated plaintiff's right to present evidence because she refused to obtain writing samples from *all* of the inmates in the housing unit before finding that the handwriting on the suspect letter matched plaintiff's handwriting.[23] (Pl.'s Resp. at 7).

---

[23] This basis for his due process claim was not raised in the amended complaint. (*See* AC at 9, ¶¶ u, w). Generally, a party may not raise new claims in his or her response to a motion for summary judgment. *See Brown v. Raimondo*, 9:06–CV–0773, 2009 WL 799970, at *2, n. 2 (N.D.N.Y. March 25, 2009) (Report–Recommendation of Treece, M.J., *adopted by* Suddaby, J.) ("The Court notes that

### i.    Seven Minute Conversation

Defendant Eggleston denies plaintiff's allegations and states that the transcript of the hearing belies plaintiff's claim that any off-the-record, ex parte conversations occurred. (Eggleston Aff. ¶¶ 16-19).  A review of the transcript shows that there is no basis for plaintiff's allegations.  During the hearing, the telephone rang, defendant Eggleston answered, and she had a conversation with the individual on the other end. (Eggleston Aff. Ex. B at 25).  From the conversation, it is apparent that the person on the other end of the telephone was defendant Chase, and at the end of the conversation, defendant Eggleston stated that "Lieutenant Chase is coming." (*Id.*)

While they were waiting for defendant Chase, defendant Eggleston and plaintiff discussed obtaining documents. (*Id.* at 25-26).  Plaintiff complained that he should have obtained documents at least 24 hours before the hearing, and complained that he needed the time to prepare a defense.  Defendant Eggleston then asked if plaintiff needed more time, and he said yes, but that he still would like defendant Chase to

---

opposition papers [on summary judgment motions] are not the proper vehicle to instill new causes of action or add new defendants."), *aff'd*, 373 F. App'x 93 (2d Cir. 2010); *Smith v. Greene*, 9:06–CV–0505, 2011 WL 1097863, at *3, n. 5 (N.D.N.Y. Feb.1, 2011) (Baxter, M.J.) ("[P]laintiff should not be allowed to assert any new claims at this stage of the case, particularly through his response to a summary judgment motion."), *adopted by*, 2011 WL 1097862 (N.D.N.Y. March 22, 2011) (Suddaby, J.); *Jackson v. Onondaga Cnty.*, 549 F. Supp. 2d 204, 219–20 (N.D.N.Y. 2008) (McAvoy, J., *adopting* Report–Recommendation of Lowe, M.J.) (finding that pro se civil rights plaintiff's complaint should not be effectively amended by his new allegations presented in his response to defendants' motion for summary judgment); *Shaheen v. McIntyre*, 9:05–CV–0173, 2007 WL 3274835, at *1, 9 (N.D.N.Y. Nov. 5, 2007) (McAvoy, J., *adopting* Report–Recommendation of Lowe, M.J.) (finding that pro se civil rights plaintiff's complaint should not be effectively amended by his new allegations presented in his response to defendants' motion for summary judgment). Because, plaintiff did not raise this issue in the amended complaint, defendant Eggleston did not address it in her affidavit.  Notwithstanding the above, and because this is an alternative finding, the court will consider the merits of this claim in addition to the other bases for plaintiff's due process claim against defendant Eggleston.

come and testify because plaintiff had some questions. (*Id.* at 26). Defendant

Eggleston stated "Okay. What we're going to do then at this time, I am going to

adjourn this hearing, or stop the tape." Plaintiff said "Right." (*Id.*) The tape was

stopped at 9:45 a.m. "so that [defendant Eggleston could] evaluate Lieutenant Chase's

materials." Plaintiff agreed, and defendant Eggleston also stated that she would

evaluate what they could give plaintiff to look at. (*Id.*) Thus, plaintiff agreed to

stopping the tape recording, and the tape was off until 10:05 a.m. Defendant Chase

then testified about his investigation. (*Id.* at 27-41).

There is no indication that plaintiff was asked to step out of the room at any

time as he alleges in the amended complaint. (AC at 9 ¶ u). In any event, if plaintiff

was not present during the alleged conversation, it is unclear how he would have

known that defendant Chase discussed the subject matter of the investigation with

defendant Eggleston.[24] In her affidavit, defendant Eggleston specifically states that "it

was [her] invariable practice as Hearing Officer never to have a witness in the hearing

room without the inmate being present." (Eggleston Aff. ¶ 19). She correctly states

---

[24] The court also notes that the transcript contradicts plaintiff's assertion in the amended
complaint that defendant Eggleston told plaintiff to step out. The transcript reads as follows:

| | |
|---|---|
| Jones: | . . . I'm objecting to the seven minute conversation you had with Chase off the record before he testified. |
| Eggleston: | I didn't have a seven minute conversation with him. |
| Jones: | Yes it was. Yes. When he came in you all was discussing . . . what was the nature of the investigative material. You told him to step out. |
| Eggleston: | That didn't have nothing [sic], that had nothing to do with this investigation. |
| Jones: | Okay. All right All right. [sic] That's cool. . . . . |

(Eggleston Aff. Ex. B at 82).

that the transcript shows that, from the time of defendant Chase's arrival until the conclusion of his testimony, plaintiff was present. (*Id.*) (citing Ex. B at 26-41).

Plaintiff was afforded the opportunity to question defendant Chase about his investigation during the testimony. Defendant Whalen and Sergeant Giambruno also testified at the hearing. (*Id.* at 44-47). Inmate Alexander testified at the hearing as a witness for plaintiff. (*Id.* at 50-58). Inmate Alexander testified that he did not believe that plaintiff wrote the letter because he always typed his letters. (*Id.* at 57).

At the end of the hearing, when plaintiff was noting all of his objections, he objected to the "seven minute conversation" that defendant Eggleston had with defendant Chase "off the record" before he testified. (*Id.* at 82). Defendant Eggleston stated on the record, that she did not have a seven minute conversation with defendant Chase, and that whatever discussion she had with him "had nothing to do with this investigation." (*Id.*) As reflected in the portion of the transcript referred to in footnote 24 above, the plaintiff accepted the defendant Whalen's response to his objection during the hearing. No reasonable fact finder could credit plaintiff's conclusory allegation regarding an ex parte communication, given the clearly contradictory evidence in the record.

## ii. Documentary Evidence

Plaintiff claims that his due process rights were violated because defendant Eggleston refused to produce the handwriting samples taken from the other porters on the unit. The court also notes that at the hearing, plaintiff asked for handwriting samples from *all* inmates in his housing unit and samples from other members of the

Inmate Liaison Committee ("ILC").[25]  Plaintiff was given the threatening letter and the samples of his own handwriting that were used as a comparison. (Eggleston Aff. Ex. B at 22-23).  Defendant Eggleston stated that plaintiff's samples and the threatening letter were the only "pertinent" samples, and that she was not going to produce the samples from the other eight porters, obtain samples from other ILC members or obtain samples from 50 other inmates on the unit.[26] (*Id.* at 6, 17-18, 42-43).

Plaintiff claims that defendant Eggleston did not give appropriate reasons for her refusal.  A hearing officer does not violate due process by excluding irrelevant or unnecessary evidence or testimony. *Kawalinski v. Morse*, 201 F.3d 103, 109 (2d Cir. 1999) (citing *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991)); *Chavis v. vonHagn*, No. 02-CV-119, 2009 WL 236060, at *62 (W.D.N.Y. Jan. 30, 2009) (citing *Kawalinski, supra*).

It is clear from defendant Eggleston's comment that she believed she had the "pertinent" information, and that she believed the samples of the other inmates' handwriting that were determined not to match the threatening letter were not relevant to the hearing.  She specifically stated that asking for handwriting samples from all the ILC members was not a reasonable request, as was plaintiff's request for samples from all the inmates on the unit. (Eggleston Aff. Ex. B at 9).  Defendant Eggleston noted

---

[25] Inmate Alexander was the Vice Chairperson of the ILC, and plaintiff's theory was that someone on the ILC wrote the letter, pretending to be Alexander in order to get Alexander into trouble. (Eggleston Aff. Ex. B. at 14).

[26] Initially, defendant Eggleston stated that although she was not going to obtain 50 samples, she would "do probably a reasonable number like three." (Eggleston Aff. Ex. B at 5).  She then asked plaintiff "which inmates would you like," but plaintiff did not give her any names and continued to request all the inmates.

that there were no other members of the ILC in plaintiff's dorm, other than Alexander, and the threatening letter referred to officers who worked in plaintiffss and Alexander's housing unit. (*Id*. at 17-18). Defendant Eggleston credited defendant Whalen's and defendant Chase's testimony that none of the other samples matched the letter, thus producing the samples taken from the eight porters was also not necessary. Plaintiff had the opportunity to argue that *his* samples did not match the threatening letter. Thus, defendant Eggleston was justified in refusing to produce or obtain the requested evidence.

### iii.    Sufficiency of the Evidence

Defendant Chase and Whalen compared the threatening letter with samples of plaintiff's handwriting and samples of the handwriting of eight porters who lived on the same unit. They both testified at plaintiff's hearing, and stated that plaintiff's was the only sample that came close to the handwriting in the threatening letter. Plaintiff had the opportunity to question them. Defendant Whalen also testified that she was plaintiff's counselor and was familiar with his handwriting, but that when she was approached to help with the investigation "at no time was a specific inmate directed to [her]." (Eggleston Aff. Ex. B at 45-47). Plaintiff was allowed to present his witnesses, including the inmate who was impersonated in the letter.

Sergeant Giambruno also testified that he was involved in the investigation, and he remembered comparing the threatening letter to three or four different inmates' samples, given to him by officers. (*Id.* at 48). He stated that he compared a couple of samples from plaintiff's unit and some from another building who had previously been

housed in plaintiff's unit. However, Sergeant Giambruno did not find enough similarities in any of the letters. (*Id.* at 49). When he was not successful in finding a match, he turned a copy of the letter over to defendant Whalen, and ended his involvement in the case. (*Id.*) He was not involved in determining that plaintiff's handwriting was a match for the threatening letter. (*Id.*)

The proof relied upon by defendant Eggleston constituted at least "some evidence" sufficient to satisfy the requirements of due process applicable to prison disciplinary hearings. *See, e.g.*, *Monier v. Holt*, 4:CV-05-2062, 2005 WL 3531369, at *2 (M.D. Pa. Dec. 21, 2005), *aff'd*, 259 F. App'x 518 (3d Cir. 2007) (testimony of officer that the threatening note was comparable to a sample of petitioner's handwriting constituted "some evidence" sufficient for due process); *Brown v. Dotson*, 1:07CV114-03, 2007 WL 1033359, at *3 (W.D.N.C. Apr. 2, 2007), *aff'd*, 242 F. App'x 19 (4th Cir. 2007) (testimony regarding handwriting comparison by investigating officer constituted "some evidence" for due process purposes even though a copy of the inappropriate letter he was accused of writing was not made available to him); *Pettus v. McGinnis*, 533 F. Supp. 2d 337, 341 n. 3 (W.D.N.Y. 2008) (fact that a harassing letter appeared to be in plaintiff's handwriting, and that he had handed a copy to a correction officer, constituted "some evidence" supporting the disciplinary charge); *Bennett v. Jackson*, 2:06CV019, 2006 WL 618124, at *2 (E.D. Ark. Mar. 9, 2006) (testimony by officer that handwriting on the threatening letter was comparable to a sample of plaintiff's writing satisfied due process standards).

Defendant Eggleston read a lengthy decision into the record that is supported by

at least "some" evidence. (*Id.* at 87). She stated that she discussed the witnesses that she found were credible and the witnesses that were less relevant. She explained why she made her determination, discussed the sentence, and reminded plaintiff of his right to appeal. (*Id.* at 87-88).

The court notes that this determination was later administratively reversed after plaintiff filed an Article 78 proceeding challenging the determination. (Prack Aff. ¶ 21 & Ex. D). Defendant Prack states that this was "[d]ue to an overabundance of caution." (*Id.*) Notwithstanding that reversal, the hearing officer's failure to make an independent examination of the handwriting would not have violated plaintiff's federal due process rights. *See, e.g.*, *Monier v. Holt*, 2005 WL 3531369, at *2 (hearing officer did not violate due process by accepting the officer's testimony regarding his handwriting comparison); *Bennett v. Jackson*, 2006 WL 618124, at *2 (hearing officer who accepted officer's testimony regarding handwriting comparison without requiring expert analysis satisfied due process standards); *Brown v. Dotson*, 2007 WL 1033359, at *3 (testimony regarding handwriting comparison by investigating officer was not corroborated because the inappropriate letter plaintiff was accused of writing, which was tainted with bodily fluids, was destroyed).[27]

---

[27] In limited circumstances, the Second Circuit has required that a hearing examiner make an independent assessment of the credibility of certain sources of evidence at a prison disciplinary hearing. *See, e.g., Taylor v. Rodriguez*, 238 F.3d 188, 194 (2d Cir. 2001) (a finding based on information from a confidential informant will satisfy due process requirements only when there has been some examination of the factors relevant to the informant's credibility); *Luna v. Pico*, 356 F.3d 481, 489-90 (2d Cir. 2004) (a bare accusation from a non-testifying victim is insufficient to support a disciplinary finding unless the examiner has engaged in some examination of the factors bearing on the victim's credibility). However, the Second Circuit cases have not engrafted, on the "some evidence" standard of *Superintendent v. Hill*, a general requirement that officers at prison disciplinary hearings independently assess the reliability of other sources of evidence. *See Luna v. Pico*, 356 F.3d

In his response to the motion for summary judgment, plaintiff cites various New York State cases. *See e.g. Hill v. LeFevre*, 124 A.D.2d 383, 507 N.Y.S.2d 330 (4th Dep't 1986). This case discussed confidential testimony by an individual who did not testify in the inmate's presence. Plaintiff cites the "substantial evidence" standard, however, as stated above, the sufficiency standard for federal due process is "some" or a "modicum" of evidence. Plaintiff also cites state law cases in which it was determined that the hearing officer erred in failing to make her own determination of whether the plaintiff's handwriting was similar to the subject letter. *See Odom v. Goord*, 271 A.D.2d 723, 705 N.Y.S.2d 433 (3d Dep't 2000). In *Odom*, the court stated that although the corrections officer was not legally qualified to render an opinion that two documents contained the same handwriting, the hearing officer was so qualified. *Id.* 271 A.D.2d at 724.

As stated above, the standard for review of disciplinary hearings in state court is stricter than for federal due process purposes. In any event, in this case, defendant Eggleston had the samples of plaintiff's own writing to compare to the unknown author's threatening letter, and she did compare them. Plaintiff is complaining that defendant Eggleston did not look at the *other* inmates' letters to make an independent

---

at 491 (noting that the holding of *Taylor v. Rodriguez* regarding confidential informants provides some guidance, but is not controlling, with respect to other sources of evidence). Neither of these cases applies here. Both defendants Chase and Whalen testified regarding their investigation, there were no confidential informants, and plaintiff was allowed to question both of the defendants. His theory that they should have reviewed more handwriting samples and that defendant Chase was unreliable because he was not a handwriting expert does not implicate federal due process rights. This court concludes that *Taylor* and *Luna* do not impose a due process requirement that a hearing officer perform independent analysis of lay handwriting comparisons of a witness who testifies at a prison disciplinary hearing and is subject to cross-examination.

determination of whether defendants chose the correct inmate as the author. (Pl.'s Resp. at 8). The cases cited by plaintiff do not apply, and even if the evidence had been insufficient for state law purposes, that did not rise to the level of a constitutional violation.

### iv.    Credit for Time Served in Pre-Hearing Confinement

Finally, plaintiff alleges that it was error for defendant Eggleston to make plaintiff's sanction run from the time of the hearing, rather than giving him credit for time served in keeplock prior to the hearing. Defendant Eggleston states in her affidavit that giving credit for time served is a common practice, but the decision to grant such credit is within the discretion of the hearing officer and is not a procedural requirement. (Eggleston Aff. ¶ 33). Defendant Eggleston "rarely" granted credit for time served, and she believed it would have been "particularly inappropriate" in this case because of plaintiff's lengthy disciplinary history and because the suspension of a prior disciplinary sanction did not deter plaintiff from repeated offenses. (*Id.* ¶ 34).

The court notes that, other than a section stating that any disciplinary penalty imposed in a Tier III hearing is to run consecutively to "any other like penalty previously imposed" unless "*the hearing officer*" determines that the penalties shall run concurrently and advises the inmate, there are *no regulations* governing credit for pre-hearing confinement. N.Y. Comp. Code R. & Regs., tit.7, § 254.7(a) (2) (emphasis added). This section clearly leaves the determination of whether to run penalties consecutively or concurrently up to the hearing officer, without any procedural requirement other than notice to the inmate. The federal due process requirements do

not contain any reference to the sanctions imposed or when the sanction must begin to run after an inmate is found guilty of the violation. Thus, there is no due process implication to this claim.

### b. Telephone Violation

The sanction imposed after plaintiff's second disciplinary hearing consisted only of a short period of deprivation of privileges. The length of plaintiff's confinement was not affected. Based on *Sandin*, this court finds that plaintiff had no liberty interest protected by due process with respect to the disciplinary hearing held by defendant Meskunas. Thus, any due process claim relating to that hearing may be dismissed.

### 2. Retaliation

Plaintiff alleges that the two misbehavior reports discussed above were filed against him in retaliation for his grievance against defendant Leon. In their affidavits, both defendants Chase and Whalen state that they did not know about plaintiff's grievance against defendant Leon, and they did not issue any false or retaliatory misbehavior reports. (Chase Aff. ¶¶ 19-23; Whalen Aff. ¶¶ 24-33).

During plaintiff's deposition, he was asked which grievance he believed resulted in retaliation. (Pl.'s Dep. at 32). Plaintiff stated that "it was a number of grievances and complaints," but then he stated that only one was a grievance, and "the rest of them I think were complaints. I don't recall there being actual grievances." (*Id.*) Plaintiff specified the grievance against defendant Leon as the formal grievance that caused the alleged retaliation. (*Id.*) Plaintiff testified that when he was going to

the grievance hearing, he was sitting in the hallway, and an officer asked plaintiff to tell him the subject matter of the grievance. (*Id.* at 33). When plaintiff explained the facts of the grievance, the officer told plaintiff that "it's not a good thing to write grievances against people in Clinton, especially somebody that's well liked like Leon." (*Id.*) Plaintiff could not name the officer who allegedly gave plaintiff this information. He described the officer as "[h]eavy-set, about 5'7" or 8", brown hair, about 260 pounds . . . ." (*Id.*)

Plaintiff claims that the unknown officer gave plaintiff a hard time about a permit for his wedding band approximately one week after the above conversation. Plaintiff attributes this verbal harassment to the fact that he told the officer about the Leon grievance. (*Id.* at 35). Plaintiff testified that he wrote a "complaint" against this unknown officer. (*Id.*) It does not appear that this "complaint" was a formal grievance because plaintiff states he wrote to the Superintendent and was interviewed by a Sergeant about this issue. (*Id.* at 35-38). Plaintiff also explained that in retaliation for the grievance against Leon, and in retaliation for his wife's complaints, plaintiff's wife was harassed at various times when she was visiting. (*Id.* at 38-41). Plaintiff stated that Officer Lincoln was involved in this harassment, and unnamed officers were "whispering and pointing" at plaintiff and his wife.[28] (*Id.* at 39-30).

Plaintiff also alleges that the July 23, 2010 incident and misbehavior report were in retaliation for the Leon grievance and plaintiff's wife's complaints about poor treatment during her visits. (*Id.* at 41). Plaintiff claims that on July 23, 2010, his

---

[28] Any claims relating to these alleged incidents were dismissed after the defendants' first motion. (Dkt. Nos. 44, 45-1 at 32-33).

housing unit was searched, and he was taken to SHU. He testified that he knew these actions were in retaliation for the Leon grievance and other complaints because, after he was taken to SHU, defendant Chase interviewed plaintiff and asked him about "the complaints." (*Id.* at 42). Plaintiff told Chase "what was going on and why." (*Id.*) Plaintiff claimed that defendant Chase told plaintiff that writing complaints was not viewed favorably at Clinton,[29] and that Chase could "do anything he want[ed] because he was in charge." (*Id.*)

Although plaintiff discussed defendant Chase at great length during the deposition, there was really no indication of how he or defendant Whalen would have known about a grievance against defendant Leon or any other complaint, formal or otherwise, made by plaintiff. Defendant Whalen only became involved in the misbehavior report regarding the threatening letter because defendant Whalen was a corrections counselor, who kept all correspondence sent to her by inmates, and who was asked to assist in the investigation of the threatening letter by examining samples of plaintiff's handwriting. (Whalen Aff. ¶¶ 4, 7, 9, 11). They looked at a number of samples of inmates' writing by putting together a list of the porters housed in the same building as plaintiff for a handwriting comparison. (*Id.* ¶¶ 11-12).

Plaintiff speculates that this misbehavior report and the telephone violation charge were retaliatory based upon an alleged statement by an unknown officer and a claim that defendant Chase told plaintiff that writing grievances was not a good idea. However, plaintiff claims that this alleged retaliation was committed by officers

---

[29] Whatever plaintiff told defendant Chase during this interview could not have been the reason for retaliation. The investigation of the threatening letter was already underway.

against whom he had not written any grievances, and it is unclear how either defendant Chase or defendant Whalen would have become aware of plaintiff's grievance against defendant Leon.

In his response to the motion for summary judgment, plaintiff also speculates that his letters of complaint regarding visitation, addressed to other officers, found their way to defendant Chase. A few of the complaint letters were forwarded to Captain Holdridge, and defendant Chase testified at plaintiff's disciplinary hearing that he was Acting Captain and was reading Captain Holdridge's mail. (Pl.'s Resp. at 10-11). One of the letters attached as an exhibit states that plaintiff's "July 5, 2010 letter regarding staff complaint" was referred to Captain Holdridge. (Pl.'s Ex. N). No July 5, 2010 letter was attached.[30] The next two letters are dated July 9, 2010 and July 13, 2010 and are addressed to Superintendent LaValley. (Pl.'s Ex. O). Both letters complain about visitation and Officer Lincoln. The response from Superintendent LaValley states that at the time of the incident, defendant Chase "intervened and remedied the situation *in [her] favor*."[31] (Pl.'s Ex. P) (emphasis added).

Thus, plaintiff has not established a nexus between his protected activity and

---

[30] This might be a typographical error by Superintendent LaValley because two letters of complaint were referred to Captain Holdridge, (Pl.'s Ex. N, Q), but the letters in Exhibit O are dated July 9, and July 13.

[31] Neither plaintiff nor his wife, ever mentions defendant Chase by name, but plaintiff's letter states that his wife spoke to "a Lieutenant," who stated he would take care of the situation. (Pl.'s Ex. O; Dkt. No. 56-1, CM/ECF p.51). Plaintiff's letter then states: "After that I was call [sic] down to the visiting room approximately five minutes later." (*Id.*) Plaintiff's wife also mentions that she spoke to "a lieutenant" who remedied the situation. (Pl.'s Ex. O; Dkt. No. 56-1, CM/ECF p.52). Plaintiff's wife stated that the time elapsed was 15 minutes, but in any event it was clear that the "lieutenant," who we now know from Superintendent LaValley's letter was defendant Chase, helped plaintiff and his wife during the incident.

the alleged retaliation. Retaliation claims have been dismissed when they are supported only by conclusory allegations that the retaliation was based upon complaints against another officer. *See, e.g., Hare v. Hayden*, 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.") (citing *Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about a prior incident by another corrections officer); *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) (plaintiff failed to provide any basis to believe that a corrections counselor would retaliate for a grievance that she was not personally named in) (collecting cases); *Ciaprazi v. Goord*, 9:02-CV-915 (GLS/DEP), 2005 WL 3531464, at *8-9 (N.D.N.Y. Dec. 22, 2005) (granting summary judgment and dismissing retaliation claim based only on plaintiff's conclusory allegations that the manifest falsity of the misbehavior report and testimony during the disciplinary hearing indicated the disciplinary matters were motivated by retaliatory animus due to grievances plaintiff filed against individuals other than the defendants involved in the disciplinary action). In this case, plaintiff's current speculation that defendant Chase retaliated against plaintiff based on two letters forwarded to Captain Holdridge that defendant Chase may have seen, is unfounded. This is particularly true because in Superintendent LaValley's letter, he states that defendant Chase resolved the visitation issue in plaintiff's wife's favor.

Finally, defendants also argue that even if plaintiff had made the appropriate

showing, they would have taken the same action, notwithstanding any retaliatory motive. Defendants point out that plaintiff was found guilty of the conduct charged in the misbehavior reports. The charges in question were supported by documentary evidence, and notwithstanding the reversal of the first hearing, a review of the letters and plaintiff's handwriting shows that defendants had a reasonable basis for the charges. The PIN violation was also supported by evidence documenting the telephone calls made using plaintiff's PIN when he would have been unable to make the telephone calls. Thus, plaintiff's claims of retaliation may be dismissed. *See Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir. 1998) (where the record clearly demonstrates that the inmate in fact committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report, the defendants meet their burden of demonstrating proper, non-retaliatory reasons for filing the misbehavior report, and are entitled to summary judgement on a retaliation claim).

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 54) be **GRANTED**, and the amended complaint **DISMISSED IN ITS ENTIRETY AS TO ALL DEFENDANTS**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v.*

*Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: July 22, 2013

Hon. Andrew T. Baxter
U.S. Magistrate Judge